## NATIONAL LABOR RELATIONS BOARD *v.*
## GISSEL PACKING CO., INC., ET AL.

No. 573. Argued March 26, 1969.—Decided June 16, 1969.*

---

*Together with No. 691, *Food Store Employees Union, Local No..347, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO* v. *Gissel Packing Co., Inc.,* also on certiorari to the same court, argued March 26, 1969, and No. 585, *Sinclair Co.* v. *National Labor Relations Board,* on certiorari to the United States Court of Appeals for the First Circuit, argued March 26–27, 1969.

Dominick L. Manoli argued the cause for petitioner in No. 573. With him on the brief were *Solicitor General Griswold, Peter L. Strauss, Arnold Ordman,* and *Norton J. Come. Albert Gore* argued the cause for petitioner in No. 691. With him on the brief was *Joseph M. Jacobs. Edward J. Simerka* argued the cause for petitioner in No. 585. With him on the brief was *Eugene B. Schwartz.*

*John E. Jenkins, Jr.,* argued the cause and filed briefs for Gissel Packing Co., Inc., respondent in Nos. 573 and 691. *Lewis P. Hamlin, Jr.,* argued the cause and filed a brief for General Steel Products, Inc., et al., respondents in No. 573. *Fred F. Holroyd* argued the cause for Heck's, Inc., respondent in No. 573. With him on the brief was *Charles E. Hurt. Lawrence G. Wallace* argued the cause for respondent in No. 585. On the brief were *Solicitor General Griswold, Dominick L. Manoli,* and *Messrs. Strauss, Ordman,* and *Come.*

Briefs of *amici curiae* in Nos. 573 and 691 were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor & Congress of Industrial Organizations, and by the Associated Builders & Contractors, Inc. Briefs of *amici curiae* in No. 585 were filed by *Lambert H. Miller* for the National Association of Manufacturers; by *Harry L. Browne* for the American Retail Federation; and by *Stanley E. Tobin* for the Mechanical Specialties Co., Inc.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases involve the extent of an employer's duty under the National Labor Relations Act to recognize a union that bases its claim to representative status solely on the possession of union authorization cards, and the steps an employer may take, particularly with regard to the scope and content of statements he may make, in legitimately resisting such card-based recognition. The specific questions facing us here are whether the duty to bargain can arise without a Board election under the Act; whether union authorization cards, if obtained from a majority of employees without misrepresentation or coercion, are reliable enough generally to provide a valid, alternate route to majority status; whether a bargaining order is an appropriate and authorized remedy where an employer rejects a card majority while at the same time committing unfair labor practices that tend to undermine the union's majority and make a fair election an unlikely possibility; and whether certain specific statements made by an employer to his employees constituted such an election-voiding unfair labor practice and thus fell outside the protection of the First Amendment and § 8 (c) of the Act, 49 Stat. 452, as amended, 29 U. S. C. § 158 (c). For reasons given below, we answer each of these questions in the affirmative.

## I.

Of the four cases before us, three—*Gissel Packing Co., Heck's Inc.,* and *General Steel Products, Inc.*—were consolidated following separate decisions in the Court of Appeals for the Fourth Circuit and brought here by the National Labor Relations Board in No. 573. Food Store Employees Union, Local No. 347, the petitioning Union in *Gissel,* brought that case here in a separate petition in No. 691. All three cases present the same legal issues

in similar, uncomplicated factual settings that can be briefly described together. The fourth case, No. 585 (*Sinclair Company*), brought here from the Court of Appeals for the First Circuit and argued separately, presents many of the same questions and will thus be disposed of in this opinion; but because the validity of some of the Board's factual findings are under attack on First Amendment grounds, detailed attention must be paid to the factual setting of that case.

## Nos. 573 and 691.

In each of the cases from the Fourth Circuit, the course of action followed by the Union and the employer and the Board's response were similar. In each case, the Union waged an organizational campaign, obtained authorization cards from a majority of employees in the appropriate bargaining unit, and then, on the basis of the cards, demanded recognition by the employer. All three employers refused to bargain on the ground that authorization cards were inherently unreliable indicators of employee desires; and they either embarked on, or continued, vigorous antiunion campaigns that gave rise to numerous unfair labor practice charges. In *Gissel,* where the employer's campaign began almost at the outset of the Union's organizational drive, the Union (petitioner in No. 691), did not seek an election, but instead filed three unfair labor practice charges against the employer, for refusing to bargain in violation of § 8 (a)(5), for coercion and intimidation of employees in violation of § 8 (a)(1), and for discharge of Union adherents in violation of § 8 (a)(3).[1]  In *Heck's* an elec-

---

[1] At the outset of the Union campaign, the Company vice president informed two employees, later discharged, that if they were caught talking to Union men, "you God-damned things will go." Subsequently, the Union presented oral and written demands for recognition, claiming possession of authorization cards from 31

tion sought by the Union was never held because of nearly identical unfair labor practice charges later filed by the Union as a result of the employer's antiunion campaign, initiated after the Union's recognition demand.[2]

of the 47 employees in the appropriate unit. Rejecting the bargaining demand, the Company began to interrogate employees as to their Union activities; to promise them better benefits than the Union could offer; and to warn them that if the "union got in, [the vice president] would just take his money and let the union run the place," that the Union was not going to get in, and that it would have to "fight" the Company first. Further, when the Company learned of an impending Union meeting, it arranged, so the Board later found, to have an agent present to report the identity of the Union's adherents. On the first day following the meeting, the vice president told the two employees referred to above that he knew they had gone to the meeting and that their work hours were henceforth reduced to half a day. Three hours later, the two employees were discharged.

[2] The organizing drive was initiated by the employees themselves at Heck's Charleston warehouses. The Union first demanded recognition on the basis of 13 cards from 26 employees of the Company's three Charleston warehouses. After responding "No comment" to the Union's repeated requests for recognition, the president assembled the employees and told them of his shock at their selection of the Union; he singled out one of the employees to ask if he had signed an authorization card. The next day the Union obtained the additional card necessary to establish a majority. That same day, the leading Union supporter (the employee who had first established contacts with the Union and had solicited a large number of the cards) was discharged, and another employee was interrogated as to his Union activities, encouraged to withdraw his authorization, and warned that a Union victory could result in reduced hours, fewer raises, and withdrawal of bonuses. A second demand for recognition was made two days later, and thereafter the president summoned two known Union supporters to his office and offered them new jobs at higher pay if they would use their influence to "break up the union."

The same pattern was repeated a year later at the Company's Ashland, Kentucky, store, where the Union obtained cards from 21 of the 38 employees by October 5, 1965. The next day, the

And in *General Steel,* an election petitioned for by the Union and won by the employer was set aside by the Board because of the unfair labor practices committed by the employer in the pre-election period.[3]

In each case, the Board's primary response was an order to bargain directed at the employers, despite the absence of an election in *Gissel* and *Heck's* and the employer's victory in *General Steel.* More specifically, the Board found in each case (1) that the Union had obtained

---

assistant store manager told an employee that he knew that the Union had acquired majority status. When the Union requested recognition on October 8, however, the Company refused on the ground that it was not sure whether department heads were included in the bargaining unit—even though the cards represented a majority with or without the department heads. After a second request for recognition and an offer to submit the cards to the employer for verification, respondent again refused, on grounds of uncertainty about the definition of the unit and because a poll taken by the Company showed that a majority of the employees did not want Union representation. Meanwhile, the Company told the employees that an employee of another company store had been fired on the spot for signing a card, warned employees that the Company knew which ones had signed cards, and polled employees about their desire for Union representation without giving them assurances against reprisals.

[3] Throughout the Union's six-month organizational campaign—both before and after its demand for recognition based on possession of cards from 120 of the 207 employees in the appropriate unit—the Company's foremen and supervisors interrogated employees about their Union involvement; threatened them with discharge for engaging in Union activities or voting for the Union; suggested that unionization might hurt business and make new jobs more difficult to obtain; warned that strikes and other dire economic consequences would result (a supervisor informed a group of employees that if the Union came in, "a nigger would be the head of it," and that when the Company put in 10 new machines, "the niggers would be the operators of them"); and asserted that, although the Company would have to negotiate with the Union, it could negotiate endlessly and would not have to sign anything.

valid authorization cards [4] from a majority of the employees in the bargaining unit and was thus entitled to represent the employees for collective bargaining purposes; and (2) that the employer's refusal to bargain with the Union in violation of § 8 (a)(5) was motivated, not by a "good faith" doubt of the Union's majority status, but by a desire to gain time to dissipate that status. The Board based its conclusion as to the lack of good faith doubt on the fact that the employers had committed substantial unfair labor practices during their antiunion campaign efforts to resist recognition. Thus, the Board found that all three employers had engaged in restraint and coercion of employees in violation of § 8 (a)(1)—in *Gissel,* for coercively interrogating employees about Union activities, threatening them with discharge, and promising them benefits; in *Heck's,* for coercively interrogating employees, threatening reprisals, creating the appearance of surveillance, and offering benefits for opposing the Union; and in *General Steel,* for coercive interrogation and threats of reprisals, including discharge. In addition, the Board found that the employers in *Gissel* and *Heck's* had wrongfully discharged employees for engaging in Union activities in violation of § 8 (a)(3). And, because the employers had rejected

---

[4] The cards used in all four campaigns in Nos. 573 and 691 and in the one drive in No. 585 unambiguously authorized the Union to represent the signing employee for collective bargaining purposes; there was no reference to elections. Typical of the cards was the one used in the Charleston campaign in *Heck's,* and it stated in relevant part:

"Desiring to become a member of the above Union of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, I hereby make application for admission to membership. I hereby authorize you, your agents or representatives to act for me as collective bargaining agent on all matters pertaining to rates of pay, hours, or any other conditions of employment."

the card-based bargaining demand in bad faith, the Board found that all three had refused to recognize the Unions in violation of § 8 (a)(5).

Only in *General Steel* was there any objection by an employer to the validity of the cards and the manner in which they had been solicited, and the doubt raised by the evidence was resolved in the following manner. The customary approach of the Board in dealing with allegations of misrepresentation by the Union and misunderstanding by the employees of the purpose for which the cards were being solicited has been set out in *Cumberland Shoe Corp.,* 144 N. L. R. B. 1268 (1963) and reaffirmed in *Levi Strauss & Co.,* 172 N. L. R. B. No. 57, 68 L. R. R. M. 1338 (1968). Under the *Cumberland Shoe* doctrine, if the card itself is unambiguous (*i. e.,* states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election. In *General Steel,* the trial examiner considered the allegations of misrepresentation at length and, applying the Board's customary analysis, rejected the claims with findings that were adopted by the Board and are reprinted in the margin.[5]

---

[5] "Accordingly, I reject Respondent's contention 'that if a man is told that his card will be secret, or will be shown only to the Labor Board for the purpose of obtaining election, that this is the absolute equivalent of telling him that it will be used "only" for purposes of obtaining an election.'

. . . . .

"With respect to the 97 employees named in the attached Appendix B Respondent in its brief contends, in substance, that their cards should be rejected because each of these employees was told *one or more* of the following: (1) that the card would be used to get an election (2) that he had the right to vote either way, even

Consequently, the Board ordered the companies to cease and desist from their unfair labor practices, to offer reinstatement and back pay to the employees who had been discriminatorily discharged, to bargain with the Unions on request, and to post the appropriate notices.

On appeal, the Court of Appeals for the Fourth Circuit, in *per curiam* opinions in each of the three cases (398 F. 2d 336, 337, 339), sustained the Board's findings as to the §§ 8 (a)(1) and (3) violations, but rejected the Board's findings that the employers' refusal to bargain violated § 8 (a)(5) and declined to enforce those portions of the Board's orders directing the respondent companies to bargain in good faith. The court based its § 8 (a)(5) rulings on its 1967 decisions raising the same fundamental issues, *Crawford Mfg. Co.* v. *NLRB,* 386 F. 2d 367, cert. denied, 390 U. S. 1028 (1968); *NLRB* v. *Logan Packing Co.,* 386 F. 2d 562; *NLRB* v. *Sehon Stevenson & Co., Inc.,* 386 F. 2d 551. The court in those cases held that the 1947 Taft-Hartley amendments to the Act, which permitted the Board to resolve representation disputes by certification under § 9 (c) only by secret ballot election, withdrew from the Board the authority to order an employer to bargain under § 8 (a)(5) on the basis of cards, in the absence of NLRB certification, unless the employer knows independently of the cards that there is in fact no representation dispute. The court held that the cards themselves were so inherently unreliable that their use gave an employer virtually an automatic, good faith claim

though he signed the card (3) that the card would be kept secret and not shown to anybody except to the Board in order to get an election. For reasons heretofore explicated, I conclude that these statements, singly or jointly, do not foreclose use of the cards for the purpose designated on their face."

that such a dispute existed, for which a secret election was necessary. Thus, these rulings established that a company could not be ordered to bargain unless (1) there was no question about a Union's majority status (either because the employer agreed the cards were valid or had conducted his own poll so indicating), or (2) the employer's §§ 8 (a)(1) and (3) unfair labor practices committed during the representation campaign were so extensive and pervasive that a bargaining order was the only available Board remedy irrespective of a card majority.

Thus based on the earlier decisions, the court's reasoning in these cases was brief, as indicated by the representative holding in *Heck's:*

> "We have recently discussed the unreliability of the cards, in the usual case, in determining whether or not a union has attained a majority status and have concluded that an employer is justified in entertaining a good faith doubt of the union's claims when confronted with a demand for recognition based solely upon union authorization cards. We have also noted that the National Labor Relations Act after the Taft-Hartley amendments provides for an election as the sole basis of a certification and restricts the Board to the use of secret ballots for the resolution of representation questions. This is not one of those extraordinary cases in which a bargaining order might be an appropriate remedy for pervasive violations of § 8 (a)(1). It is controlled by our recent decisions and their reasoning. . . . There was not substantial evidence to support the findings of the Board that Heck's, Inc. had no good faith doubt of the unions' claims of majorities." 398 F. 2d, at 338–339.

*No. 585.*

In No. 585, the factual pattern was quite similar.  The petitioner, a producer of mill rolls, wire, and related products at two plants in Holyoke, Massachusetts, was shut down for some three months in 1952 as the result of a strike over contract negotiations with the American Wire Weavers Protective Association, the representative of petitioner's journeymen and apprentice wire weavers from 1933 to 1952.  The Company subsequently reopened without a union contract, and its employees remained unrepresented through 1964, when the Company was acquired by an Ohio corporation, with the Company's former president continuing as head of the Holyoke, Massachusetts, division.  In July 1965, the International Brotherhood of Teamsters, Local Union No. 404, began an organizing campaign among petitioner's Holyoke employees and by the end of the summer had obtained authorization cards from 11 of the Company's 14 journeymen wire weavers choosing the Union as their bargaining agent.  On September 20, the Union notified petitioner that it represented a majority of its wire weavers, requested that the Company bargain with it, and offered to submit the signed cards to a neutral third party for authentication.  After petitioner's president declined the Union's request a week later, claiming, *inter alia,* that he had a good faith doubt of majority status because of the cards' inherent unreliability, the Union petitioned, on November 8, for an election that was ultimately set for December 9.

When petitioner's president first learned of the Union's drive in July, he talked with all of his employees in an effort to dissuade them from joining a union.  He particularly emphasized the results of the long 1952 strike, which he claimed "almost put our company out of busi-

ness," and expressed worry that the employees were forgetting the "lessons of the past." He emphasized, secondly, that the Company was still on "thin ice" financially, that the Union's "only weapon is to strike," and that a strike "could lead to the closing of the plant," since the parent company had ample manufacturing facilities elsewhere. He noted, thirdly, that because of their age and the limited usefulness of their skills outside their craft, the employees might not be able to find re-employment if they lost their jobs as a result of a strike. Finally, he warned those who did not believe that the plant could go out of business to "look around Holyoke and see a lot of them out of business." The president sent letters to the same effect to the employees in early November, emphasizing that the parent company had no reason to stay in Massachusetts if profits went down.

During the two or three weeks immediately prior to the election on December 9, the president sent the employees a pamphlet captioned: "Do you want another 13-week strike?" stating, *inter alia*, that: "We have no doubt that the Teamsters Union can again close the Wire Weaving Department and the entire plant by a strike. We have no hopes that the Teamsters Union Bosses will not call a strike. . . . The Teamsters Union is a strike happy outfit." Similar communications followed in late November, including one stressing the Teamsters' "hoodlum control." Two days before the election, the Company sent out another pamphlet that was entitled: "Let's Look at the Record," and that purported to be an obituary of companies in the Holyoke-Springfield, Massachusetts, area that had allegedly gone out of business because of union demands, eliminating some 3,500 jobs; the first page carried a large cartoon showing the preparation of a grave for the Sinclair Company and other headstones containing the names of other plants allegedly victimized by the unions. Finally, on the day before

the election, the president made another personal appeal to his employees to reject the Union. He repeated that the Company's financial condition was precarious; that a possible strike would jeopardize the continued operation of the plant; and that age and lack of education would make re-employment difficult. The Union lost the election 7–6, and then filed both objections to the election and unfair labor practice charges which were consolidated for hearing before the trial examiner.

The Board agreed with the trial examiner that the president's communications with his employees, when considered as a whole, "reasonably tended to convey to the employees the belief or impression that selection of the Union in the forthcoming election could lead [the Company] to close its plant, or to the transfer of the weaving production, with the resultant loss of jobs to the wire weavers." Thus, the Board found that under the "totality of the circumstances" petitioner's activities constituted a violation of § 8 (a)(1) of the Act. The Board further agreed with the trial examiner that petitioner's activities, because they "also interfered with the exercise of a free and untrammeled choice in the election," and "tended to foreclose the possibility" of holding a fair election, required that the election be set aside. The Board also found that the Union had a valid card majority (the unambiguous cards, see n. 4, *supra,* went unchallenged) when it demanded recognition initially and that the Company declined recognition, not because of a good faith doubt as to the majority status, but, as the § 8 (a)(1) violations indicated, in order to gain time to dissipate that status—in violation of § 8 (a)(5). Consequently, the Board set the election aside, entered a cease-and-desist order, and ordered the Company to bargain on request.

On appeal, the Court of Appeals for the First Circuit sustained the Board's findings and conclusions and en-

forced its order in full. 397 F. 2d 157. The court rejected the Company's proposition that the inherent unreliability of authorization cards entitled an employer automatically to insist on an election, noting that the representative status of a union may be shown by means other than an election; the court thus reaffirmed its stance among those circuits disavowing the Fourth Circuit's approach to authorization cards.[6] Because of the conflict among the circuits on the card issues and because of the alleged conflict between First Amendment freedoms and the restrictions placed on employer speech by § 8 (a)(1) in *Sinclair,* No. 585, we granted certiorari to consider both questions. 393 U. S. 997 (1968). For reasons given below, we reverse the decisions of the Court of Appeals for the Fourth Circuit and affirm the ruling of the Court of Appeals for the First Circuit.

## II.

In urging us to reverse the Fourth Circuit and to affirm the First Circuit, the National Labor Relations

---

[6] See, *e. g., Joy Silk Mills, Inc.* v. *NLRB,* 87 U. S. App. D. C. 360, 185 F. 2d 732 (1950), cert. denied, 341 U. S. 914 (1951); *NLRB* v. *Gotham Shoe Mfg. Co., Inc.,* 359 F. 2d 684 (C. A. 2d Cir. 1966); *NLRB* v. *Quality Markets, Inc.,* 387 F. 2d 20 (C. A. 3d Cir. 1967); *NLRB* v. *Phil-Modes, Inc.,* 396 F. 2d 131 (C. A. 5th Cir. 1968); *Atlas Engine Works, Inc.* v. *NLRB,* 396 F. 2d 775 (C. A. 6th Cir. 1968), petition for certiorari pending; *NLRB* v. *Clark Products, Inc.,* 385 F. 2d 396 (C. A. 7th Cir. 1967); *NLRB* v. *Ralph Printing & Lithographing Co.,* 379 F. 2d 687 (C. A. 8th Cir. 1967); *NLRB* v. *Luisi Truck Lines,* 384 F. 2d 842 (C. A. 9th Cir. 1967); *Furr's, Inc.* v. *NLRB,* 381 F. 2d 562 (C. A. 10th Cir.), cert. denied, 389 U. S. 840 (1967).

In addition to the First Circuit below, four courts of appeals have subsequently considered the Fourth Circuit's view of the cards and specifically rejected it. *NLRB* v. *United Mineral & Chemical Corp.,* 391 F. 2d 829, 836, n. 10 (C. A. 2d Cir. 1968); *NLRB* v. *Goodyear Tire & Rubber Co.,* 394 F. 2d 711, 712–713 (C. A. 5th Cir. 1968); *NLRB* v. *Atco-Surgical Supports,* 394 F. 2d 659, 660 (C. A. 6th Cir. 1968); *NLRB* v. *Ozark Motor Lines,* 403 F. 2d 356 (C. A. 8th Cir. 1968).

Board contends that we should approve its interpretation and administration of the duties and obligations imposed by the Act in authorization card cases. The Board argues (1) that unions have never been limited under § 9 (c) of either the Wagner Act or the 1947 amendments to certified elections as the sole route to attaining representative status. Unions may, the Board contends, impose a duty to bargain on the employer under § 8 (a)(5) by reliance on other evidence of majority employee support, such as authorization cards. Contrary to the Fourth Circuit's holding, the Board asserts, the 1947 amendments did not eliminate the alternative routes to majority status. The Board contends (2) that the cards themselves, when solicited in accordance with Board standards which adequately insure against union misrepresentation, are sufficiently reliable indicators of employee desires to support a bargaining order against an employer who refuses to recognize a card majority in violation of § 8 (a)(5). The Board argues (3) that a bargaining order is the appropriate remedy for the § 8 (a)(5) violation, where the employer commits other unfair labor practices that tend to undermine union support and render a fair election improbable.

Relying on these three assertions, the Board asks us to approve its current practice, which is briefly as follows. When confronted by a recognition demand based on possession of cards allegedly signed by a majority of his employees, an employer need not grant recognition immediately, but may, unless he has knowledge independently of the cards that the union has a majority, decline the union's request and insist on an election, either by requesting the union to file an election petition or by filing such a petition himself under § 9 (c)(1)(B). If, however, the employer commits independent and substantial unfair labor practices disruptive of election conditions, the Board may withhold the election or set it aside, and issue instead a bargaining order as a remedy

for the various violations. A bargaining order will not issue, of course, if the union obtained the cards through misrepresentation or coercion or if the employer's unfair labor practices are unrelated generally to the representation campaign. Conversely, the employers in these cases urge us to adopt the views of the Fourth Circuit.

There is more at issue in these cases than the dispute outlined above between the Board and the four employers, however, for the Union, petitioner in No. 691, argues that we should accord a far greater role to cards in the bargaining area than the Board itself seeks in this litigation. In order to understand the differences between the Union and the Board, it is necessary to trace the evolution of the Board's approach to authorization cards from its early practice to the position it takes on oral argument before this Court. Such an analysis requires viewing the Board's treatment of authorization cards in three separate phases: (1) under the *Joy Silk* doctrine, (2) under the rules of the *Aaron Brothers* case, and (3) under the approach announced at oral argument before this Court.

The traditional approach utilized by the Board for many years has been known as the *Joy Silk* doctrine. *Joy Silk Mills, Inc.,* 85 N. L. R. B. 1263 (1949), enforced, 87 U. S. App. D. C. 360, 185 F. 2d 732 (1950). Under that rule, an employer could lawfully refuse to bargain with a union claiming representative status through possession of authorization cards if he had a "good faith doubt" as to the union's majority status; instead of bargaining, he could insist that the union seek an election in order to test out his doubts. The Board, then, could find a lack of good faith doubt and enter a bargaining order in one of two ways. It could find (1) that the employer's independent unfair labor practices were evidence of bad faith, showing that the employer was seeking time to dissipate the union's

majority. Or the Board could find (2) that the employer had come forward with no reasons for entertaining any doubt and therefore that he must have rejected the bargaining demand in bad faith. An example of the second category was *Snow & Sons,* 134 N. L. R. B. 709 (1961), enforced, 308 F. 2d 687 (C. A. 9th Cir. 1962), where the employer reneged on his agreement to bargain after a third party checked the validity of the card signatures and insisted on an election because he doubted that the employees truly desired representation. The Board entered a bargaining order with very broad language to the effect that an employer could not refuse a bargaining demand and seek an election instead "without a valid ground therefor," 134 N. L. R. B., at 710–711. See also *Dixon Ford Shoe Co., Inc.,* 150 N. L. R. B. 861 (1965); *Kellogg Mills,* 147 N. L. R. B. 342, 346 (1964), enforced, 347 F. 2d 219 (C. A. 9th Cir. 1965).

The leading case codifying modifications to the *Joy Silk* doctrine was *Aaron Brothers,* 158 N. L. R. B. 1077 (1966). There the Board made it clear that it had shifted the burden to the General Counsel to show bad faith and that an employer "will not be held to have violated his bargaining obligation . . . simply because he refuses to rely upon cards, rather than an election, as the method for determining the union's majority." 158 N. L. R. B., at 1078. Two significant consequences were emphasized. The Board noted (1) that not every unfair labor practice would automatically result in a finding of bad faith and therefore a bargaining order; the Board implied that it would find bad faith only if the unfair labor practice was serious enough to have the tendency to dissipate the union's majority. The Board noted (2) that an employer no longer needed to come forward with reasons for rejecting a bargaining demand. The Board pointed out, however, that a bargaining order would issue if it could prove that an employer's "course of conduct"

gave indications as to the employer's bad faith. As examples of such a "course of conduct," the Board cited *Snow & Sons, supra; Dixon Ford Shoe Co., Inc., supra,* and *Kellogg Mills, supra,* thereby reaffirming *John P. Serpa, Inc.,* 155 N. L. R. B. 99 (1965), where the Board had limited *Snow & Sons* to its facts.

Although the Board's brief before this Court generally followed the approach as set out in *Aaron Brothers, supra,* the Board announced at oral argument that it had virtually abandoned the *Joy Silk* doctrine altogether. Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election. Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; he need give no affirmative reasons for rejecting a recognition request, and he can demand an election with a simple "no comment" to the union. The Board pointed out, however, (1) that an employer could not refuse to bargain if he *knew,* through a personal poll for instance, that a majority of his employees supported the union, and (2) that an employer could not refuse recognition initially because of questions as to the appropriateness of the unit and then later claim, as an afterthought, that he doubted the union's strength.

The Union argues here that an employer's right to insist on an election in the absence of unfair labor practices should be more circumscribed, and a union's right to rely on cards correspondingly more expanded, than the Board would have us rule. The Union's contention is that an employer, when confronted with a card-based bargaining demand, can insist on an election only by filing the election petition himself immediately under

§ 9 (c)(1)(B) and not by insisting that the Union file the election petition, whereby the election can be subjected to considerable delay. If the employer does not himself petition for an election, the Union argues, he must recognize the Union regardless of his good or bad faith and regardless of his other unfair labor practices, and should be ordered to bargain if the cards were in fact validly obtained. And if this Court should continue to utilize the good faith doubt rule, the Union contends that at the least we should put the burden on the employer to make an affirmative showing of his reasons for entertaining such doubt.

Because the employers' refusal to bargain in each of these cases was accompanied by independent unfair labor practices which tend to preclude the holding of a fair election, we need not decide whether a bargaining order is ever appropriate in cases where there is no interference with the election processes.

With the Union's arguments aside, the points of difference between the employers and the Board will be considered in the following manner. The validity of the cards under the Act, their intrinsic reliability, and the appropriateness of a bargaining order as a response to violations of § 8 (a)(5) as well as §§ 8 (a)(1) and (3) will be discussed in the next section. The nature of an employer's reaction to an organizational campaign, and particularly the Board's conclusion that the employer's statements in No. 585 contained threats of reprisal and thus constituted restraint and coercion in violation of § 8 (a)(1) and not protected speech, will be covered in the final section.

### III.

### A.

The first issue facing us is whether a union can establish a bargaining obligation by means other than a Board election and whether the validity of alternate routes to

majority status, such as cards, was affected by the 1947 Taft-Hartley amendments. The most commonly traveled[7] route for a union to obtain recognition as the exclusive bargaining representative of an unorganized group of employees is through the Board's election and certification procedures under § 9 (c) of the Act (29 U. S. C. § 159 (c)); it is also, from the Board's point of view, the preferred route.[8] A union is not limited to a Board election, however, for, in addition to § 9, the present Act provides in § 8 (a)(5) (29 U. S. C. § 158 (a)(5)), as did the Wagner Act in § 8 (5), that "[i]t shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)." Since § 9 (a), in both the Wagner Act and the present Act, refers to the representative as the one "designated or selected" by a majority of the employees without specifying precisely how that representative is to be chosen, it was early recognized that an employer had a duty to bargain whenever the union representative presented "convincing evidence of majority support."[9] Almost from the inception of the Act,

---

[7] In 1967, for instance, the Board conducted 8,116 elections but issued only 157 bargaining orders based on a card majority. *Levi Strauss & Co.,* 172 N. L. R. B. No. 57, 68 L. R. R. M. 1338, 1342, n. 9 (1968). See also Sheinkman, Recognition of Unions Through Authorization Cards, 3 Ga. L. Rev. 319 (1969). The number of card cases that year, however, represents a rather dramatic increase over previous years, from 12 such cases in 1964, 24 in 1965, and about 117 in 1966. Browne, Obligation to Bargain on Basis of Card Majority, 3 Ga. L. Rev. 334, 347 (1969).

[8] See, *e. g., Aaron Brothers,* 158 N. L. R. B. 1077 (1966); cf., *General Shoe Corp.,* 77 N. L. R. B. 124 (1948). An employer, of course, may not, even if he acts in good faith, recognize a minority union, *Garment Workers' Union* v. *NLRB,* 366 U. S. 731 (1961).

[9] *NLRB* v. *Dahlstrom Metallic Door Co.,* 112 F. 2d 756, 757 (C. A. 2d Cir. 1940).

then, it was recognized that a union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8 (a)(5)—by showing convincing support, for instance, by a union-called strike or strike vote,[10] or, as here, by possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes.[11]

We have consistently accepted this interpretation of the Wagner Act and the present Act, particularly as to the use of authorization cards. See, *e. g., NLRB* v. *Bradford Dyeing Assn.,* 310 U. S. 318, 339–340 (1940); *Franks Bros. Co.* v. *NLRB,* 321 U. S. 702 (1944); *United Mine Workers* v. *Arkansas Flooring Co.,* 351 U. S. 62 (1956). Thus, in *United Mine Workers, supra,* we noted that a "Board election is not the only method by which an employer may satisfy itself as to the union's majority status," 351 U. S., at 72, n. 8, since § 9 (a), "which deals expressly with employee representation, says nothing as to how the employees' representative shall be chosen," 351 U. S., at 71. We therefore pointed out in that case, where the union had obtained signed authorization cards from a majority of the employees, that "[i]n the absence of any bona fide dispute[12] as to the existence of the required majority of eligible employees, the employer's denial of recognition of the union would have violated

---

[10] See, *e. g., Denver Auto Dealers Assn.,* 10 N. L. R. B. 1173 (1939); *Century Mills, Inc.,* 5 N. L. R. B. 807 (1938).

[11] The right of an employer lawfully to refuse to bargain if he had a good faith doubt as to the Union's majority status, even if in fact the Union did represent a majority, was recognized early in the administration of the Act, see *NLRB* v. *Remington Rand, Inc.,* 94 F. 2d 862, 868 (C. A. 2d Cir.), cert. denied, 304 U. S. 576 (1938).

[12] See n. 11, *supra.*

§ 8 (a)(5) of the Act." 351 U. S., at 69. We see no reason to reject this approach to bargaining obligations now, and we find unpersuasive the Fourth Circuit's view that the 1947 Taft-Hartley amendments, enacted some nine years before our decision in *United Mine Workers, supra,* require us to disregard that case. Indeed, the 1947 amendments weaken rather than strengthen the position taken by the employers here and the Fourth Circuit below. An early version of the bill in the House would have amended § 8 (5) of the Wagner Act to permit the Board to find a refusal-to-bargain violation only where an employer had failed to bargain with a union "currently recognized by the employer or certified as such [through an election] under section 9." Section 8 (a)(5) of H. R. 3020, 80th Cong., 1st Sess. (1947). The proposed change, which would have eliminated the use of cards, was rejected in Conference (H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 41 (1947)), however, and we cannot make a similar change in the Act simply because, as the employers assert, Congress did not expressly approve the use of cards in rejecting the House amendment. Nor can we accept the Fourth Circuit's conclusion that the change was wrought when Congress amended § 9 (c) to make election the sole basis for *certification* by eliminating the phrase "any other suitable method to ascertain such representatives," [13] under which the Board had occasionally used cards as a certification basis. A certified union has the benefit of numerous special privileges

---

[13] Section 9 (c) of the Wagner Act had provided:

"Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify . . . the name or names of the representatives that have been designated or selected. In any such investigation, the Board . . . may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives."

which are not accorded unions recognized voluntarily or under a bargaining order[14] and which, Congress could determine, should not be dispensed unless a union has survived the crucible of a secret ballot election.

The employers rely finally on the addition to § 9 (c) of subparagraph (B), which allows an employer to petition for an election whenever "one or more individuals or labor organizations have presented to him a claim[15] to be recognized as the representative defined in section 9 (a)." That provision was not added, as the employers assert, to give them an absolute right to an election at any time; rather, it was intended, as the legislative history indicates, to allow them, after being asked to bargain, to test out their doubts as to a union's majority in a secret election which they would then presumably not cause to be set aside by illegal antiunion activity.[16]  We

---

[14] *E. g.*, protection against the filing of new election petitions by rival unions or employees seeking decertification for 12 months (§ 9 (c) (3)), protection for a reasonable period, usually one year, against any disruption of the bargaining relationship because of claims that the union no longer represents a majority (see *Brooks* v. *NLRB*, 348 U. S. 96 (1954)), protection against recognitional picketing by rival unions (§ 8 (b) (4) (C)), and freedom from the restrictions placed in work assignments disputes by § 8 (b) (4) (D), and on recognitional and organizational picketing by § 8 (b) (7).

[15] Under the Wagner Act, which did not prescribe who would file election petitions, the Board had ruled that an employer could seek an election only when two unions presented conflicting bargaining requests on the ground that if he were given the same election petition rights as the union, he could interrupt union drives by demanding an election before the union had obtained majority status. The 1947 amendments resolved the difficulty by providing that an employer could seek an election only after he had been requested to bargain. See H. R. Rep. No. 245, 80th Cong., 1st Sess., 35 (1947).

[16] The Senate report stated that the "present Board rules . . . discriminate against employers who have reasonable grounds for

agree with the Board's assertion here that there is no
suggestion that Congress intended § 9 (c)(1)(B) to re-
lieve any employer of his § 8 (a)(5) bargaining obliga-
tion where, without good faith, he engaged in unfair labor
practices disruptive of the Board's election machinery.
And we agree that the policies reflected in § 9 (c)(1)(B)
fully support the Board's present administration of the
Act (see *supra,* at 591–592); for an employer can insist
on a secret ballot election, unless, in the words of the
Board, he engages "in contemporaneous unfair labor prac-
tices likely to destroy the union's majority and seriously
impede the election." Brief for Petitioner, the Board, in
No. 573, p. 36.

In short, we hold that the 1947 amendments did not
restrict an employer's duty to bargain under § 8 (a)(5)
solely to those unions whose representative status is
certified after a Board election.[17]

---

believing that labor organizations claiming to represent their em-
ployees are really not the choice of the majority." S. Rep. No. 105,
80th Cong., 1st Sess., 10 (1947). Senator Taft stated during
the debates:

"Today an employer is faced with this situation. A man comes
into his office and says, 'I represent your employees. Sign this
agreement, or we strike tomorrow.'. . . The employer has no way
in which to determine whether this man really does represent his
employees or does not. The bill gives him the right to go to the
Board . . . and say, 'I want an election. I want to know who is
the bargaining agent for my employees.'" 93 Cong. Rec. 3838
(1947).

[17] As aptly stated in Lesnick, Establishment of Bargaining Rights
Without an NLRB Election, 65 Mich. L. Rev. 851, 861–862 (1967):

"Cards have been used under the act for thirty years; [this]
Court has repeatedly held that certification is not the only route
to representative status; and the 1947 attempt in the House-passed
Hartley Bill to amend section 8 (a)(5) . . . was rejected by the
conference committee that produced the Taft-Hartley Act. No
amount of drum-beating should be permitted to overcome, without
legislation, this history."

## B.

We next consider the question whether authorization cards are such inherently unreliable indicators of employee desires that, whatever the validity of other alternate routes to representative status, the cards themselves may never be used to determine a union's majority and to support an order to bargain. In this context, the employers urge us to take the step the 1947 amendments and their legislative history indicate Congress did not take, namely, to rule out completely the use of cards in the bargaining arena. Even if we do not unhesitatingly accept the Fourth Circuit's view in the matter, the employers argue, at the very least we should overrule the *Cumberland Shoe* doctrine (see *supra,* at 584) and establish stricter controls over the solicitation of the cards by union representatives.[18]

---

[18] In dealing with the reliability of cards, we should re-emphasize what issues we are not confronting. As pointed out above, we are not here faced with a situation where an employer, with "good" or "bad" subjective motivation, has rejected a card-based bargaining request without good reason and has insisted that the Union go to an election while at the same time refraining from committing unfair labor practices that would tend to disturb the "laboratory conditions" of that election. We thus need not decide whether, absent election interference by an employer's unfair labor practices, he may obtain an election only if he petitions for one himself; whether, if he does not, he must bargain with a card majority if the Union chooses not to seek an election; and whether, in the latter situation, he is bound by the Board's ultimate determination of the card results regardless of his earlier good faith doubts, or whether he can still insist on a Union-sought election if he makes an affirmative showing of his positive reasons for believing there is a representation dispute. In short, a union's right to rely on cards as a freely interchangeable substitute for elections where there has been no election interference is not put in issue here; we need only decide whether the cards are reliable enough to support a bargaining order where a fair election probably could not have been held, or where an election that was held was in fact set aside.

The objections to the use of cards voiced by the employers and the Fourth Circuit boil down to two contentions:[19] (1) that, as contrasted with the election procedure,[20] the cards cannot accurately reflect an employee's wishes, either because an employer has not had a chance to present his views and thus a chance to insure that the employee choice was an informed one, or because the choice was the result of group pressures and not individual decision made in the privacy of a voting booth; and (2) that quite apart from the election comparison, the cards are too often obtained through misrepresentation and coercion which compound the cards' inherent inferiority to the election process. Neither contention is persuasive, and each proves too much. The Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support.[21] The acknowledged superiority of the election process, however, does not mean that cards are thereby rendered totally invalid, for where an employer engages in conduct disruptive of the election process, cards may be the most effective—perhaps the only—way of assuring employee choice. As for misrepresentation, in any specific case of

---

[19] The Board's reliance on authorization cards has provoked considerable scholarly controversy. Compare criticism of Board policy, particularly its treatment of ambiguous, dual-purpose cards, in Browne, *supra*, n. 7, and Comment, Union Authorization Cards, 75 Yale L. J. 805 (1966), with defense of Board practice in Lesnick, *supra*, n. 17; Welles, The Obligation to Bargain on the Basis of a Card Majority, 3 Ga. L. Rev. 349 (1969); and Comment, Union Authorization Cards: A Reliable Basis for an NLRB Order To Bargain?, 47 Texas L. Rev. 87 (1968).

[20] For a comparison of the card procedure and the election process, see discussion in *NLRB* v. *Logan Packing Co.*, 386 F. 2d 562, 564–566 (C. A. 4th Cir. 1967).

[21] See nn. 7–8, *supra*.

alleged irregularity in the solicitation of the cards, the proper course is to apply the Board's customary standards (to be discussed more fully below) and rule that there was no majority if the standards were not satisfied. It does not follow that because there are some instances of irregularity, the cards can never be used; otherwise, an employer could put off his bargaining obligation indefinitely through continuing interference with elections.

That the cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when that process has been impeded, needs no extended discussion, for the employers' contentions cannot withstand close examination. The employers argue that their employees cannot make an informed choice because the card drive will be over before the employer has had a chance to present his side of the unionization issues. Normally, however, the union will inform the employer of its organization drive early in order to subject the employer to the unfair labor practice provisions of the Act; the union must be able to show the employer's awareness of the drive in order to prove that his contemporaneous conduct constituted unfair labor practices on which a bargaining order can be based if the drive is ultimately successful. See, *e. g., Hunt Oil Co.*, 157 N. L. R. B. 282 (1966); *Don Swart Trucking Co.*, 154 N. L. R. B. 1345 (1965). Thus, in all of the cases here but the Charleston campaign in *Heck's* the employer, whether informed by the union or not, was aware of the union's organizing drive almost at the outset and began its antiunion campaign at that time; and even in the *Heck's* Charleston case, where the recognition demand came about a week after the solicitation began, the employer was able to deliver a speech before the union obtained a majority. Further, the employers argue that without a secret ballot an employee may, in

a card drive, succumb to group pressures or sign simply to get the union "off his back" and then be unable to change his mind as he would be free to do once inside a voting booth. But the same pressures are likely to be equally present in an election, for election cases arise most often with small bargaining units [22] where virtually every voter's sentiments can be carefully and individually canvassed. And no voter, of course, can change his mind after casting a ballot in an election even though he may think better of his choice shortly thereafter.

The employers' second complaint, that the cards are too often obtained through misrepresentation and coercion, must be rejected also in view of the Board's present rules for controlling card solicitation, which we view as adequate to the task where the cards involved state their purpose clearly and unambiguously on their face. We would be closing our eyes to obvious difficulties, of course, if we did not recognize that there have been abuses, primarily arising out of misrepresentations by union organizers as to whether the effect of signing a card was to designate the union to represent the employee for collective bargaining purposes or merely to authorize it to seek an election to determine that issue. And we would be equally blind if we did not recognize that various courts of appeals and commentators [23] have differed significantly as to the effectiveness of the Board's *Cumberland Shoe* doctrine (see *supra,* at 584) to cure such abuses.

Thus, even where the cards are unambiguous on their face, both the Second Circuit (*NLRB* v. *S. E. Nichols Co.,* 380 F. 2d 438 (1967)) and the Fifth Circuit (*Engineers & Fabricators, Inc.* v. *NLRB,* 376 F. 2d 482 (1967)) have joined the Fourth Circuit below

---

[22] See Comment, Union Authorization Cards: A Reliable Basis for an NLRB Order To Bargain?, *supra,* at 94 and n. 32.

[23] See n. 19, *supra.*

in rejecting the Board's rule that the cards will be counted unless the solicitor's statements amounted under the circumstances to an assurance that the cards would be used only for an election, or for no other purpose than an election. And even those circuits which have adopted the Board's approach have criticized the Board for tending too often to apply the *Cumberland* rule too mechanically, declining occasionally to uphold the Board's application of its own rule in a given case. See, *e. g., NLRB* v. *Southbridge Sheet Metal Works, Inc.,* 380 F. 2d 851 (C. A. 1st Cir. 1967); *NLRB* v. *Sandy's Stores, Inc.,* 398 F. 2d 268 (C. A. 1st Cir. 1968); *NLRB* v. *Swan Super Cleaners, Inc.,* 384 F. 2d 609 (C. A. 6th Cir. 1967); *NLRB* v. *Dan Howard Mfg. Co.,* 390 F. 2d 304 (C. A. 7th Cir. 1968); *Furr's, Inc.* v. *NLRB,* 381 F. 2d 562 (C. A. 10th Cir. 1967); *UAW* v. *NLRB,* 129 U. S. App. D. C. 196, 392 F. 2d 801 (1967). Among those which reject the *Cumberland* rule, the Fifth Circuit agrees with the Second Circuit (see *S. E. Nichols Co., supra*), that a card will be vitiated if an employee was left with the impression that he would be able to resolve any lingering doubts and make a final decision in an election, and further requires that the Board probe the subjective intent of each signer, an inquiry expressly avoided by *Cumberland.* See *NLRB* v. *Southland Paint Co.,* 394 F. 2d 717, 728, 730 (C. A. 5th Cir. 1968); *Engineers & Fabricators, Inc.* v. *NLRB, supra.* Where the cards are ambiguous on their face, the Fifth Circuit, joined by the Eighth Circuit (see, *e. g., NLRB* v. *Peterson Bros.,* 342 F. 2d 221 (C. A. 5th Cir. 1965), and *Bauer Welding & Metal Fabricators, Inc.* v. *NLRB,* 358 F. 2d 766 (C. A. 8th Cir. 1966)), departs still further from the Board rule. And there is a conflict among those courts which otherwise follow the Board as to single-purpose cards (compare *NLRB* v. *Lenz Co.,* 396 F. 2d 905, 908 (C. A. 6th Cir. 1968), with *NLRB* v. *C. J. Glasgow Co.,* 356 F. 2d 476, 478 (C. A. 7th Cir. 1966)).

We need make no decision as to the conflicting approaches used with regard to dual-purpose cards, for in each of the five organization campaigns in the four cases before us the cards used were single-purpose cards, stating clearly and unambiguously on their face that the signer designated the union as his representative. And even the view forcefully voiced by the Fourth Circuit below that unambiguous cards as well present too many opportunities for misrepresentation comes before us somewhat weakened in view of the fact that there were no allegations of irregularities in four of those five campaigns (*Gissel,* the two *Heck's* campaigns,[24] and *Sinclair*). Only in *General Steel* did the employer challenge the cards on the basis of misrepresentations. There, the trial examiner, after hearing testimony from over 100 employees and applying the traditional Board approach (see n. 5, *supra*), concluded that "all of these employees not only intended, but were fully aware, that they were thereby designating the Union as their representative." Thus, the sole question before us, raised in only one of the four cases here, is whether the *Cumberland Shoe* doctrine is an adequate rule under the Act for assuring employee free choice.

In resolving the conflict among the circuits in favor of approving the Board's *Cumberland* rule, we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee

---

[24] In the Charleston campaign in *Heck's*, the employees handled the card drive themselves from beginning to end, contacting the union, obtaining the blank authorization cards, and soliciting their fellow employees on that basis; no union agents were involved in the card signing.

a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election. Elections have been, after all, and will continue to be, held in the vast majority of cases; the union will still have to have the signatures of 30% [25] of the employees when an employer rejects a bargaining demand and insists that the union seek an election. We cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else. In addition to approving the use of cards, of course, Congress has expressly authorized reliance on employee signatures alone in other areas of labor relations, even where criminal sanctions hang in the balance,[26] and we should not act hastily in disregarding congressional judgments that employees can be counted on to take responsibility for their acts.

We agree, however, with the Board's own warnings in *Levi Strauss & Co.,* 172 N. L. R. B. No. 57, 68 L. R. R. M. 1338, 1341, and n. 7 (1968), that in hearing testimony concerning a card challenge, trial examiners should not neglect their obligation to ensure employee free choice by

---

[25] See 1969 CCH Guidebook to Labor Relations ¶ 402.4.

[26] Criminal sanctions are imposed by § 302 (29 U. S. C. § 186) which makes it unlawful for an employer to pay to and for a union representative to receive "any money or other thing of value." Section 302 (c) (4) (29 U. S. C. § 186 (c) (4)) exempts payments by employers to union representatives of union dues, however, where an employee has executed a "written assignment" of the dues, *i. e.,* a check-off authorization. Signatures are also relied on in § 9 (c) (1) (A) (29 U. S. C. § 159 (c) (1) (A)), which provides for Board processing of representation and decertification petitions when each is supported by a "substantial number of employees" (the basis for the 30% signature requirement, see n. 25, *supra*), and in § 9 (e) which specifically provides for 30% of the signatures in the bargaining unit to empower the Board to hold a union shop de-authorization election.

a too easy mechanical application of the *Cumberland* rule.[27] We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8 (a)(1).[28] We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry. We nevertheless feel that the trial examiner's findings in *General Steel* (see n. 5, *supra*) represent the limits of the *Cumberland* rule's application. We emphasize that the Board should be careful to guard

---

[27] In explaining and reaffirming the *Cumberland Shoe* doctrine in the context of unambiguous cards, the Board stated:

"Thus the fact that employees are told in the course of solicitation that an election is contemplated, or that a purpose of the card is to make an election possible, provides in our view *insufficient* basis in itself for vitiating unambiguously worded authorization cards on the theory of misrepresentation. A different situation is presented, of course, where union organizers solicit cards on the explicit or indirectly expressed representation that they will use such cards *only* for an election and subsequently seek to use them for a different purpose . . . ."

The Board stated further in a footnote:

"The foregoing does not of course imply that a finding of misrepresentation is confined to situations where employees are expressly told in *haec verba* that the 'sole' or 'only' purpose of the cards is to obtain an election. The Board has never suggested such a mechanistic application of the foregoing principles, as some have contended. The Board looks to substance rather than to form. It is not the use or nonuse of certain key or 'magic' words that is controlling, but whether or not the totality of circumstances surrounding the card solicitation is such, as to add up to an assurance to the card signer that his card will be used for no purpose other than to help get an election." 172 N. L. R. B. No. 57, 68 L. R. R. M. 1338, 1341–1342, and n. 7.

[28] See Sheinkman, *supra*, n. 7, at 332–333.

against an approach any more rigid than that in *General Steel*. And we reiterate that nothing we say here indicates our approval of the *Cumberland Shoe* rule when applied to ambiguous, dual-purpose cards.

The employers argue as a final reason for rejecting the use of the cards that they are faced with a Hobson's choice [29] under current Board rules and will almost inevitably come out the loser. They contend that if they do not make an immediate, personal investigation into possible solicitation irregularities to determine whether in fact the union represents an uncoerced majority, they will have unlawfully refused to bargain for failure to have a good faith doubt of the union's majority; and if they do make such an investigation, their efforts at polling and interrogation will constitute an unfair labor practice in violation of § 8 (a)(1) and they will again be ordered to bargain. As we have pointed out, however, an employer is not obligated to accept a card check as proof of majority status, under the Board's current practice, and he is not required to justify his insistence on an election by making his own investigation of employee sentiment and showing affirmative reasons for doubting the majority status. See *Aaron Brothers*, 158 N. L. R. B. 1077, 1078. If he does make an investigation, the Board's recent cases indicate that reasonable polling in this regard will not always be termed violative of § 8 (a)(1) if conducted in accordance with the requirements set out in *Struksnes Construction Co.*, 165 N. L. R. B. No. 102, 65 L. R. R. M. 1385 (1967). And even if an employer's limited interrogation is found violative of the Act, it might not be serious enough to call for a bargaining order. See *Aaron Brothers, supra; Hammond & Irving, Inc.*, 154 N. L. R. B. 1071

---

[29] See Judge Brown's "Scylla and Charybdis" analogy in *NLRB* v. *Dan River Mills*, 274 F. 2d 381, 388 (C. A. 5th Cir. 1960).

(1965). As noted above, the Board has emphasized that not "any employer conduct found violative of Section 8 (a)(1) of the Act, regardless of its nature or gravity, will necessarily support a refusal-to-bargain finding," *Aaron Brothers, supra,* at 1079.

## C.

Remaining before us is the propriety of a bargaining order as a remedy for a § 8 (a)(5) refusal to bargain where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside. We have long held that the Board is not limited to a cease-and-desist order in such cases, but has the authority to issue a bargaining order without first requiring the union to show that it has been able to maintain its majority status. See *NLRB* v. *Katz,* 369 U. S. 736, 748, n. 16 (1962); *NLRB* v. *P. Lorillard Co.,* 314 U. S. 512 (1942). And we have held that the Board has the same authority even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered. *Franks Bros. Co.* v. *NLRB,* 321 U. S. 702 (1944). We see no reason now to withdraw this authority from the Board. If the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him "to profit from [his] own wrongful refusal to bargain," *Franks Bros., supra,* at 704, while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation

to bargain; [30] and any election held under these circumstances would not be likely to demonstrate the employees' true, undistorted desires.[31]

The employers argue that the Board has ample remedies, over and above the cease-and-desist order, to control employer misconduct. The Board can, they assert, direct the companies to mail notices to employees, to read

---

[30] The Board indicates here that its records show that in the period between January and June 1968, the median time between the filing of an unfair labor practice charge and a Board decision in a contested case was 388 days. But the employer can do more than just put off his bargaining obligation by seeking to slow down the Board's administrative processes. He can also affect the outcome of a rerun election by delaying tactics, for figures show that the longer the time between a tainted election and a rerun, the less are the union's chances of reversing the outcome of the first election. See n. 31, *infra*.

[31] A study of 20,153 elections held between 1960 and 1962 shows that in the 267 cases where rerun elections were held over 30% were won by the party who caused the election to be set aside. See Pollitt, NLRB Re-Run Elections: A Study, 41 N. C. L. Rev. 209, 212 (1963). The study shows further that certain unfair labor practices are more effective to destroy election conditions for a longer period of time than others. For instance, in cases involving threats to close or transfer plant operations, the union won the rerun only 29% of the time, while threats to eliminate benefits or refuse to deal with the union if elected seemed less irremediable with the union winning the rerun 75% of the time. *Id.*, at 215–216. Finally, time appears to be a factor. The figures suggest that if a rerun is held too soon after the election before the effects of the unfair labor practices have worn off, or too long after the election when interest in the union may have waned, the chances for a changed result occurring are not as good as they are if the rerun is held sometime in between those periods. Thus, the study showed that if the rerun is held within 30 days of the election or over nine months after, the chances that a different result will occur are only one in five; when the rerun is held within 30–60 days after the election, the chances for a changed result are two in five. *Id.*, at 221.

notices to employees during plant time and to give the union access to employees during working time at the plant, or it can seek a court injunctive order under § 10 (j) (29 U. S. C. § 160 (j)) as a last resort. In view of the Board's power, they conclude, the bargaining order is an unnecessarily harsh remedy that needlessly prejudices employees' § 7 rights solely for the purpose of punishing or restraining an employer. Such an argument ignores that a bargaining order is designed as much to remedy past election damage [32] as it is to deter future misconduct. If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign.[33]

[32] The employers argue that the Fourth Circuit correctly observed that, "in the great majority of cases, a cease and desist order with the posting of appropriate notices will eliminate any undue influences upon employees voting in the security of anonymity." *NLRB* v. *Logan Packing Co.*, 386 F. 2d, at 570. It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10 (c) of the Act (29 U. S. C. § 160 (c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. See *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203 (1964). "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Consolo* v. *FMC*, 383 U. S. 607, 621 (1966).

[33] It has been pointed out that employee rights are affected whether or not a bargaining order is entered, for those who desire representation may not be protected by an inadequate rerun election, and those who oppose collective bargaining may be prejudiced by a bargaining order if in fact the union would have lost an election absent employer coercion. See Lesnick, *supra*, n. 17, at 862. Any

There is, after all, nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation petition. For, as we pointed out long ago, in finding that a bargaining order involved no "injustice to employees who may wish to substitute for the particular union some other . . . arrangement," a bargaining relationship "once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed," after which the "Board may, . . . upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships." *Frank Bros., supra,* at 705–706.

Before considering whether the bargaining orders were appropriately entered in these cases, we should summarize the factors that go into such a determination. Despite our reversal of the Fourth Circuit below in Nos. 573 and 691 on all major issues, the actual area of disagreement between our position here and that of the Fourth Circuit is not large as a practical matter. While refusing to validate the general use of a bargaining order in reliance on cards, the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, without need of inquiry into majority status on the basis of cards or otherwise, in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices.

---

effect will be minimal at best, however, for there "is every reason for the union to negotiate a contract that will satisfy the majority, for the union will surely realize that it must win the support of the employees, in the face of a hostile employer, in order to survive the threat of a decertification election after a year has passed." Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L. Rev. 38, 135 (1964).

Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." *NLRB* v. *Logan Packing Co.*, 386 F. 2d 562, 570 (C. A. 4th Cir. 1967); see also *NLRB* v. *Heck's, Inc.*, 398 F. 2d 337, 338. The Board itself, we should add, has long had a similar policy of issuing a bargaining order, in the absence of a § 8 (a)(5) violation or even a bargaining demand, when that was the only available, effective remedy for substantial unfair labor practices. See, *e. g., United Steelworkers of America* v. *NLRB*, 126 U. S. App. D. C. 215, 376 F. 2d 770 (1967); *J. C. Penney Co., Inc.* v. *NLRB*, 384 F. 2d 479, 485–486 (C. A. 10th Cir. 1967).

The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected

by a bargaining order, then such an order should issue (see n. 32, *supra*).

We emphasize that under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. There is, the Board says, no *per se* rule that the commission of any unfair practice will automatically result in a § 8 (a)(5) violation and the issuance of an order to bargain. See *Aaron Brothers, supra*.

With these considerations in mind, we turn to an examination of the orders in these cases. In *Sinclair*, No. 585, the Board made a finding, left undisturbed by the First Circuit, that the employer's threats of reprisal were so coercive that, even in the absence of a § 8 (a)(5) violation, a bargaining order would have been necessary to repair the unlawful effect of those threats.[34] The Board therefore did not have to make the determination called for in the intermediate situation above that the risks that a fair rerun election might not be possible were too great to disregard the desires of the employees already expressed through the cards. The employer argues, however, that its communications to its employees were protected by the First Amendment and § 8 (c) of the Act (29 U. S. C. § 158 (c)), whatever the effect of those communications on the union's majority or the Board's ability to ensure a fair election; it is to that contention that we shall direct our final attention in the next section.

In the three cases in Nos. 573 and 691 from the Fourth Circuit, on the other hand, the Board did not make a

---

[34] Under the doctrine of *Bernel Foam Products Co.*, 146 N. L. R. B. 1277 (1964), there is nothing inconsistent in the Union's filing an election petition and thereby agreeing that a question of representation exists, and then filing a refusal-to-bargain charge after the election is lost because of the employer's unfair labor practices.

similar finding that a bargaining order would have been necessary in the absence of an unlawful refusal to bargain. Nor did it make a finding that, even though traditional remedies might be able to ensure a fair election, there was insufficient indication that an election (or a rerun in *General Steel*) would definitely be a more reliable test of the employees' desires than the card count taken before the unfair labor practices occurred. The employees argue that such findings would not be warranted, and the court below ruled in *General Steel* that available remedies short of a bargaining order could guarantee a fair election. 398 F. 2d 339, 340, n. 3. We think it possible that the requisite findings were implicit in the Board's decisions below to issue bargaining orders (and to set aside the election in *General Steel*); and we think it clearly inappropriate for the court below to make any contrary finding on its own (see n. 32, *supra*). Because the Board's current practice at the time required it to phrase its findings in terms of an employer's good or bad faith doubts (see Part II, *supra*), however, the precise analysis the Board now puts forth was not employed below, and we therefore remand these cases for proper findings.

## IV.

We consider finally petitioner Sinclair's First Amendment challenge to the holding of the Board and the Court of Appeals for the First Circuit. At the outset we note that the question raised here most often arises in the context of a nascent union organizational drive, where employers must be careful in waging their antiunion campaign. As to conduct generally, the above-noted gradations of unfair labor practices, with their varying consequences, create certain hazards for employers when they seek to estimate or resist unionization efforts. But so long as the differences involve conduct easily avoided, such as discharge, surveillance, and coer-

cive interrogation, we do not think that employers can complain that the distinctions are unreasonably difficult to follow. Where an employer's antiunion efforts consist of speech alone, however, the difficulties raised are not so easily resolved. The Board has eliminated some of the problem areas by no longer requiring an employer to show affirmative reasons for insisting on an election and by permitting him to make reasonable inquiries. We do not decide, of course, whether these allowances are mandatory. But we do note that an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8 (c) (29 U. S. C. § 158 (c)) merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8 (a)(1). Section 8 (a)(1), in turn, prohibits interference, restraint or coercion of employees in the exercise of their right to self-organization.

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8 (a)(1) and the proviso to § 8 (c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the

election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk. Cf. *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).

Within this framework, we must reject the Company's challenge to the decision below and the findings of the Board on which it was based. The standards used below for evaluating the impact of an employer's statements are not seriously questioned by petitioner and we see no need to tamper with them here. Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See *Textile Workers* v. *Darlington Mfg. Co.,* 380 U. S. 263, 274, n. 20 (1965). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. We therefore agree with the court below that "[c]onveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality

of closing is capable of proof." 397 F. 2d 157, 160. As stated elsewhere, an employer is free only to tell "what he reasonably believes will be the likely economic consequences of unionization that are outside his control," and not "threats of economic reprisal to be taken solely on his own volition." *NLRB* v. *River Togs, Inc.,* 382 F. 2d 198, 202 (C. A. 2d Cir. 1967).

Equally valid was the finding by the court and the Board that petitioner's statements and communications were not cast as a prediction of "demonstrable 'economic consequences,' " 397 F. 2d, at 160, but rather as a threat of retaliatory action. The Board found that petitioner's speeches, pamphlets, leaflets, and letters conveyed the following message: that the company was in a precarious financial condition; that the "strike-happy" union would in all likelihood have to obtain its potentially unreasonable demands by striking, the probable result of which would be a plant shutdown, as the past history of labor relations in the area indicated; and that the employees in such a case would have great difficulty finding employment elsewhere. In carrying out its duty to focus on the question: "[W]hat did the speaker intend and the listener understand?" (A. Cox, Law and the National Labor Policy 44 (1960)), the Board could reasonably conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities. In this connection, we need go no further than to point out (1) that petitioner had no support for its basic assumption that the union, which had not yet even presented any demands, would have to strike to be heard, and that it admitted at the hearing that it had no basis for attributing other plant closings in the area to unionism; and (2) that the Board has often found that employees, who are particularly sensitive to rumors

of plant closings,[35] take such hints as coercive threats rather than honest forecasts.[36]

Petitioner argues that the line between so-called permitted predictions and proscribed threats is too vague to stand up under traditional First Amendment analysis and that the Board's discretion to curtail free speech rights is correspondingly too uncontrolled. It is true that a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship, see *NLRB* v. *Virginia Electric & Power Co.*, 314 U. S. 469, 479 (1941). But an employer, who has control over that relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in " 'brinkmanship' " when it becomes all too easy to "overstep and tumble [over] the brink," *Wausau Steel Corp.* v. *NLRB*, 377 F. 2d 369, 372 (C. A. 7th Cir. 1967). At the least he can avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees.

For the foregoing reasons, we affirm the judgment of the Court of Appeals for the First Circuit in No. 585, and we reverse the judgments of the Court of Appeals for the Fourth Circuit in Nos. 573 and 691 insofar as they decline enforcement of the Board's orders to bargain and remand those cases to that court with directions to remand to the Board for further proceedings in conformity with this opinion.                    *It is so ordered.*

---

[35] See Bok, *supra,* n. 33, at 77; n. 31, *supra.*

[36] See, *e. g., Kolmar Laboratories, Inc.,* 159 N. L. R. B. 805, 807–810, and cases (relied on by the trial examiner here) cited at 809, n. 3, enforced, 387 F. 2d 833 (C. A. 7th Cir. 1967); *Surprenant Mfg. Co.,* 144 N. L. R. B. 507, 510–511, enforced, 341 F. 2d 756, 761 (C. A. 6th Cir. 1965).