In the Matter of the TOWN OF CLAY, Petitioner, v ROBERT D. HELSBY et al., Constituting the Public Employment Relations Board, et al., Respondents.

Fourth Department, February 20, 1976

*O'Hara, O'Hara & Vars (Edward O'Hara, III*, of counsel), for petitioner.

*Martin L. Barr (Robert J. Miller* of counsel), for respondents.

SIMONS, J. The Town of Clay seeks a review of the determination and order of the Public Employment Relations Board (PERB), which ordered the town to cease and desist from certain unfair labor practices and to negotiate with Service Employees International Union, Local 200, AFL-CIO, as representative of the town's Highway Department personnel.

The appeal presents for the first time the question of whether PERB has power to issue an order compelling a public employer to negotiate with a union which the employer has not recognized, in the absence of an election of the union by the public employees. We must also determine whether this ultimate sanction, if available at all, is appropriate under the facts presented in this case. A majority of PERB's members have held that it may issue such an order here because the town has been guilty of an unfair labor practice of "substantial * * * nature to the extent that an election could not be conducted under laboratory conditions."

The case arises from these facts.

During the fall and winter of 1971 there had been extensive discussions and negotiations between the union's organizer, Mr. Villani, and appellant's former Town Supervisor, Mr. Butterfield, looking toward union representation for the men in the Town Highway Department, activities described in detail in our prior decision.[1] In October, 1971 the union had

---

1. The matter is before us for the second time. On prior appeal *(Matter of Town of Clay v Helsby*, 45 AD2d 292), we reviewed two charges of unfair conduct by the public employer. The first charge alleged that the town was guilty of an unfair practice in refusing to negotiate with the union after recognizing it. The second charge alleged that the Town Supervisor had improperly interrogated the employees and withdrawn a budgeted wage increase. We found that substantial evidence supported PERB's

secured cards signed by 12 of the 19 employees of the Highway Department. The signatures on the cards had been authenticated by a third party. Nevertheless, the town refused to recognize the union and the matter was unresolved at the end of the year. In January, 1972 a newly elected Town Supervisor, Loxley Firth, took office. The hearing officer's findings, adopted by PERB, state that on January 17, 1972 Mr. Firth held meetings in his office at which he inquired of each Highway Department employee individually whether the employee had "signed a union card" and whether he "wished to be represented by the union." The only other person in the office during these meetings was the Town Clerk who acted as recorder. After receiving legal advice, Mr. Firth realized that he "had made a mistake" in questioning the employees. He testified that he assembled all the men later in the day and "told them that I had been wrong in what I had done, that it was ignorance on my part. I apologized to them and expressed to them the desire to * * * what shall I say * * * overcome any damage that I might have done in their own minds. That * * * well, I think I repeated a number of times that this was unfortunate ignorance on my part." One of the assembled employees asked Mr. Firth "what was going to happen as to the raise they had expected to receive?" (The question referred to a wage increase approved by the Town Board in the budget adopted in November, 1971 and effective in January, 1972.) Firth replied that "a raise at this time would be inappropriate as it could be construed as possibly a bribe in order to sway * * * feelings towards the union. At the present time it would be improper to grant." Another employee asked whether the men would get the raise eventually, and Firth replied, "I'm sorry, I couldn't answer you because it appears that whatever I say, one way or another, could be construed as anti or pro-union. Therefore, although I would like to be able to answer the question, I just couldn't do so."

Citing the time and place of the interrogation, the personnel involved, and the town's anti-union attitude as evidenced by its failure to recognize the union after authentication of a majority by the signatures on the authorization cards, PERB found that these acts were done by the Supervisor with the

determination on the second charge but we reversed the finding that the town had recognized the union and was guilty of an improper practice because it failed to negotiate with the union. Because PERB had not imposed separate penalties for the two charges, we remitted to the Board for reconsideration and a further order.

purpose of depriving the employees of their rights to organize under section 202 of the Civil Service Law. The town was found guilty of an unfair labor practice because its supervisor improperly interrogated the Highway Department employees about each one's union or non-union preferences and because it had withdrawn budgeted wage increases (see Civil Service Law, § 209-a, subd 1, par [a]). In our prior decision we held that substantial evidence supported PERB's finding that the town had committed an unlawful practice.

But that is not the end of it, for the order directing the town to negotiate must be based upon the finding that the employer's improper conduct has destroyed the climate in which a free election may be conducted. It is PERB's determination of that issue which is now before us for review.

PERB's decision and order to negotiate was decided by a divided vote[2] of the board members. Their disagreement is best understood after reviewing the decision of the United States Supreme Court in *NLRB v Gissel Packing Co.* (395 US 575). In *Gissel* the court recognized that a fair election was the preferable course for determining representation in union disputes but it held, nevertheless, that an employer may be ordered to bargain without the election required by statute when he has frustrated the possibility of a fair election by his unfair labor practices. The decision set forth three categories of improper practices under the National Labor Relations Act: (1) exceptional cases marked by "outrageous" and "pervasive" unfair labor practices, such that the coercive effects cannot be eliminated by traditional measures,[3] (2) cases in which the

---

**2.** At the time of the original decision, there were only two members of the board. Chairman Helsby ordered the town to negotiate because it had recognized the union. Alternatively, he found the board's order to negotiate was justified because the improper employer practice was so flagrant and coercive that the climate for a fair election was destroyed. He cited *NLRB v Gissel Packing Co.* (395 US 575) in support of this alternative basis for his bargaining order. The other board member, Mr. Crowley, agreed that the town had recognized the union and accordingly concurred in the original order. On the alternative ground, he agreed that certification was an appropriate remedy if there was independent evidence of the union's majority status and the possibility of a fair election was destroyed by the employer's acts, but he did not find sufficient evidence of such conduct in this case. When the case was reconsidered by the board after our reversal, Mr. Denson, who had not participated in the original decision, wrote for himself and Chairman Helsby and held that there was independent evidence of a pro-union majority and that the employer's coercive acts had prevented a fair election. Mr. Crowley reiterated the reasoning in his original dissent.

**3.** This category appears to be the basis of Chairman Helsby's original decision.

improper activity has been less outrageous and pervasive and in which there has been a showing that the union had a majority of the employees (the majority's stated basis for the order of PERB now before us),[4] and (3) minor unfair labor practices which have minimal impact on the election machinery and which do not justify the issuance of the bargaining order (PERB's dissenting member believed the case fit into this last category). The court ruled that a bargaining order may not issue automatically upon a finding of an unfair labor practice but only after all the circumstances of the situation are examined and the chances for a fair election found to be "slight". While this decision from the private sector is not binding in public employment cases (Civil Service Law, § 209-a, subd 3), it is helpful, particularly since PERB cited *Gissel* as authority for its original decision and since it formulated the decision now under review in language similar to that employed by the *Gissel* court. Upon this appeal, however, PERB minimizes the applicability of the *Gissel* holding and rests its decision on its broadly based power to determine the representation of public employees from "other evidence", i.e., authorization cards signed by a majority of the employees in this case (see Civil Service Law, § 207, subd 2).

Our review is governed by familiar rules. PERB is entrusted with broad powers to implement the provisions of the Taylor Act and resolve public employer-employee disputes (Civil Service Law, §§ 205, 207). It may "ascertain the public employees' choice of employee organization as their representative" by recognition or certification after an election (Civil Service Law, § 207) and it may prescribe remedies for improper employee practices (Civil Service Law, § 205, subd 5, par [a]). As has been said before, administrative agencies have wide discretion in the choice of a remedy "deemed adequate to cope with the unlawful practices" in question and the courts are not quick to interfere with that discretion *(Siegel Co. v Trade Comm.,* 327 US 608, 611,612-613). However, while the authority of the agency to resolve disputes and to fashion suitable

---

4. *Gissel* involved four appeals. The improper acts for the three cases in category two are stated in footnotes 1, 2 and 3 starting at page 580. They included interrogation and polling of the employees by the employer, warnings that if the union "got in", the plants would be abandoned, surveillance of the employees, promises of benefits for voting against the union, threats and actual reduction in hours and pay for union sympathizers, and discharge of pro-union employees. The acts in the *Sinclair* appeal which the court found "pervasive" and "outrageous" (category 1) are summarized at pages 587 to 589.

remedies is beyond dispute, the Taylor Act provides that a reviewing court has the power "to make and enter a judgment or decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the board" (Civil Service Law, § 213, subd [d]). It is for the courts to examine the reasonable application of PERB's remedies (see *Matter of City of Albany v Helsby,* 29 NY2d 433, 438; *Matter of New York State Public Employment Relations Bd. v Board of Educ. of City of Buffalo,* 46 AD2d 509, 513; *Matter of Greenburgh No. 11 Federation of Teachers v Helsby,* 41 AD2d 329, 330). It is particularly appropriate that we do so here, for a bargaining order is more than a punitive measure, designed to deter future abuses. It is also a therapeutic remedy, intended to correct improper actions and used as a substitute for the unpredictable result of a fair election, which PERB has found is now impossible. Such orders should not be automatically issued any time an unfair labor practice is found, but only when the unfair practice has destroyed the opportunity to confirm the card majority by an election.

The first question, whether PERB may ever issue an order without an election or acts of recognition by the employer, is quickly answered. The practice of imposing bargaining orders when there is an unlawful failure to negotiate has been accepted in the private sector and we see no irreconcilable difference that prevents its use in an apppropriate case involving governmental employment.

· We next examine the grounds stated in PERB's decision and consider whether the remedy was properly imposed in this case.

At the outset it is appropriate to point out that there may be a significant difference in the degree of sophistication which union organizers and representatives of public employers possess, a difference which ordinarily does not exist in private labor relations. In this case Mr. Firth, the supervisor and chief executive officer of the Town of Clay, was not an experienced management employee, fairly judged by standards imposed in the private sector. He was, by trade, a self-employed gunsmith with one-year experience in politics and newly elected to this part-time office. He testified that he interrogated the men because he was "in the dark" on the union matter and knew that at the December 27 meeting of the Town Board the disputed union issue had been deferred to his administration. Of course, interrogation by an employer is

not forbidden by law, per se. The practice becomes unlawful only when it is done "deliberately * * * to interfere with, restrain or coerce public employees in the exercise of their rights * * * for the purpose of depriving them of their rights" (Civil Service Law, § 209-a subd 1, par [a]).

PERB was within its powers in finding upon conflicting evidence that Mr. Firth's questioning was of a coercive nature because it was conducted by management, in management's office, without secrecy and without assurances that no reprisals would be forthcoming. However, in view of the finding by PERB that employee sentiment had changed between October and January (due in part to actions of the town's agents in circulating anti-union petitions, to be sure), and Mr. Firth's inexperience, his conduct was at least understandable.

PERB also held that the interrogation was "aggravated" when Mr. Firth met with the employees that afternoon and withdrew the raise. Under accepted principles of law, Mr. Firth was faced with a dilemma at that meeting, for the granting of a benefit may constitute an unfair labor practice as readily as the withholding of one (e.g. see *NLRB v Parts Co.*, 375 US 405). He called the men together on the advice of counsel and all the questions relating to salaries originated with the employees, not with Mr. Firth. On any view of the record, the meeting was essentially corrective and PERB's inference of coercion from this incident is unreasonable.

Furthermore, PERB's determination that the town was chargeable with anti-union bias because it did not recognize the union or call for an election when confronted with the card majority is not legally supportable. There is no statutory requirement that a public employer must recognize an employee organization without an election (Civil Service Law, § 204). If the employer does not engage in any unfair labor practice (and none has been charged in this case prior to the incidents of January 17, 1972), it may not be penalized for putting the union organizers to their proof that they represent a majority of the employees (see *Linden Lbr. Div. v NLRB,* 419 US 301. and see *Matter of Town of Clay v Helsby,* 45 AD2d 292). Of course, an employer runs a risk by delay. The parties' inevitable flow of emotions after a demand for recognition may cloud the issue and result in improper employee and employer practices, forcing reconsideration of the card majority by PERB and the imposition of a bargaining order. Regulations promulgated by PERB, however, specify that a petition

to determine representation may be filed by "one or more public employees or any employee organization acting in their behalf, or by a public employer" (4 NYCRR 201.2 [a]) and no reason is cited why the inaction of both parties in demanding an election should result in the imputation of an anti-union bias to the employer. Neither the statutes, regulations nor court decisions require an employer to recognize a union or initiate a representation election and the responsibility for seeking an election should fairly be shared by the organizing union seeking certification.

Undoubtedly in the minds of some (particularly a union organizer possessing signed authorization cards), the delay and uncertainty of an election may be no better than the second best method of determining employee union sentiment, particularly when the employer has been guilty of a subsequent unlawful practice. But we are not convinced that a card majority is always the most reliable test. There are a number of reasons why its accuracy may be doubted, the foremost of which is that an employee is subject to peer group pressure, as well as employer pressure, which determines whether the employee gives or withholds his signature. The acknowledgment that some of the employees involved in this dispute signed as many as two or three different cards during the relatively brief period from October to January is evidence of that fact.

It remains for us to determine what impact the employer's interrogations had on the ability to hold a free election. *Gissel* instructs us that before a bargaining order is appropriate in cases in which the union has a card majority, the board must find that "the possibility * * * of ensuring a fair election * * * is slight" *(NLRB v Gissel Packing Co.,* 395 US 575, 614, *supra).* A limited interrogation, even if violative of the act, may not be enough *(id.* p 609).

The value of other cases on the subject is limited because decisions are necessarily made on an *ad hoc* basis, but it may be helpful to review two Federal cases with similar fact patterns. In each case a bargaining order was found inappropriate under the *Gissel* formulations.

In *NLRB v East Side Shopper* (498 F2d 1334) the board found that the employer had violated the act by (1) its coercive interrogation of one employee, (2) granting vacation benefits to part-time employees, (3) instituting new rules on layoff and grievance procedures, and (4) discharging three

employees who had participated in the union organization effort. The United States Court of Appeals found that substantial evidence supported a finding that the National Labor Relations Act had been violated, but that substantial evidence did not support the bargaining order. The court granted enforcement of the board's order in part, but denied enforcement of the bargaining order.

In *NLRB v Gruber's Super Market* (501 F2d 697) the employer called a meeting of employees three days before election and (1) asked each why he wanted a union, and (2) told the employees that if the union did not win, the employees would get a raise. The United States Court of Appeals rejected NLRB's decision to impose a bargaining order as the remedy because its decision did not specify why a fair union election would not be possible. The court then analyzed the facts to determine whether it was possible to conduct a fair election and concluded that a bargaining order was unwarranted because: (1) the record did not show open and continuous hostility to the union, (2) the record did not disclose that the employees lost interest in the union, and (3) the entry of a cease and desist order and posting of an appropriate notice would decrease the likelihood of future misconduct by the employer.

Judged by these standards, the decision to impose certification of the union upon the town without an election in this case is an abuse of PERB's authority. There was apparently continual activity by both sides after the cards were authenticated in the fall of 1971 and, as PERB found, there were substantial swings in employee sentiment toward the union and away from it. However, the record lacks evidence of employer hostility, threats of reprisal, firings, or the types of economic pressure which have a real and continuing impact making the possibility of a fair election "slight". There is nothing in the record to indicate present union strength or to support the board's statement that new employees, opposed to the union, have been hired by the town. In short there has been a good deal of the tugging and hauling of the employees common in such situations by both parties, but nothing to indicate that an election fairly measuring union sentiment cannot now be held.

In the final analysis, our concern is to minimize tensions that disrupt employer-employee relationships and insure that public employees enjoy the option of exercising their statuto-

rily guaranteed choice on the question of representation. The selection should be free of interference from union forces and free of fear of economic reprisal from the employer. When a contest develops, the sentiment of the employees must be measured as accurately as possible as soon as practical. This end will usually be accomplished best by a prompt election which is the procedure which should be pursued here even though the outcome may be influenced in some degree by improper practices on one or both sides. In severe cases a fair election may become impossible because of the improper activities of the employer and a bargaining order must necessarily be imposed to protect the employees' rights. But determining the degree of harm done by the improper acts is always an elusive process for a board or court because it requires that we undertake the difficult task of weighing the effects which past events may have on the psychology of a future election. A bargaining order should not be one of our first alternatives for correcting employer wrongs, but rather one of the last.

The determination and order should be modified by deleting the provisions of paragraph 1 and as modified it should be confirmed.

MARSH, P.J., CARDAMONE, MAHONEY and GOLDMAN, JJ., concur.

Determination unanimously modified in accordance with opinion by SIMONS, J., and as modified confirmed, without costs.