In the Matter of the CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., et al., Appellants, v HARVEY MILOWE et al., Respondents. (Proceeding No. 1.)

In the Matter of the CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., Petitioner, v HAROLD NEWMAN et al., Constituting the Public Employment Relations Board, et al., Respondents. (Proceeding No. 2.)

Third Department, January 11, 1979

40

## APPEARANCES OF COUNSEL

*Roemer & Featherstonhaugh (James W. Roemer, Jr.,* of counsel), for appellants.

*Martin L. Barr* for Harold Newman and others, respondents.

*James R. Sandner* for Public Employees Federation, respondent.

*Louis J. Lefkowitz, Attorney-General (Michael F. Colligan*

and *William J. Kogan* of counsel), for James B. Northrop and another, respondents.

## OPINION OF THE COURT

KANE, J.

On August 31, 1977, the Public Employees Federation (PEF) filed a petition for decertification of CSEA as the exclusive bargaining representative for the Professional, Scientific and Technical Services Bargaining Unit (PS&T unit) and certification of PEF as its bargaining agent. In order to file such a petition, PERB required that the petition be supported by a showing of interest of at least 30% of the employees in the unit already in existence (4 NYCRR 201.3 [e]). In compliance therewith, PEF filed signature cards and/or petitions allegedly representing a 30% showing of interest. On October 4, 1977, the assistant director of Public Employment Practices and Representation determined that PEF had made the necessary showing. On October 7, 1977, CSEA formally requested that PERB conduct a signature comparison to determine whether PEF had actually established a 30% showing of interest. This request was denied.

On October 26, 1977, the director of Public Employment Practices and Representation (director) determined that the petition which had been filed by PEF was timely and ordered an election in the PS&T unit. In January of 1978, CSEA sought to stop this election by seeking actual authentication of the signatures comprising the showing of interest. This attempt to gain judicial review was dismissed by Special Term pursuant to subdivision (b) of section 213 of the Civil Service Law.* The election, conducted by CSEA, was held in April of 1978. PEF won with a vote of 15,062 to CSEA's 12,259.

CSEA promptly filed objections to the election. During the postelection hearing, hearsay evidence of forgery in the showing of interest was elicited. CSEA, therefore, joined complaints of fraud and forgery to its earlier attack on the sufficiency of the showing of interest. After a protracted hearing which resulted in a voluminous record that included the receipt in evidence of numerous exhibits, the director, by decision dated July 20, 1978, overruled all objections filed by CSEA. This

---

* Subdivision (b) of section 213 of the Civil Service Law, when read in conjunction with section 207 of the Civil Service Law, precludes judicial review of PERB orders during certification proceedings until PERB finally issues a certification order.

decision was affirmed by PERB on September 27, 1978, and it concurrently certified PEF as the representative of the PS&T unit. Certification of PEF as the representative of the PS&T unit has been stayed pending this proceeding and dues deductions are being held in escrow during this period. Consolidated with this appeal are CSEA's challenges to both the ruling of Special Term, which dismissed its petition in March, and the September order of PERB certifying PEF as the representative of the PS&T unit. The issues raised fall into three broad categories: (1) defects in the showing of interest, (2) favoritism on the part of the State towards PEF, and (3) the ineligibility of any union to have challenged CSEA's representation of the PS&T unit at the time PEF filed its certification petition (timeliness of the petition). Considering these issues in their inverse order, we address ourselves first to the effect of subdivision 2 of section 208 of the Civil Service Law on the timeliness of PEF's petition under the facts presented.

CSEA entered into a contract with the State on behalf of the PS&T unit for the period April 1, 1973 through March 31, 1976. The same parties subsequently entered into a new contract for a term beginning April 1, 1976 and ending March 31, 1978. On June 3, 1977, the parties executed a new two-year agreement to cover from April 1, 1977 to March 31, 1979. At issue is the effect of subdivision 2 of section 208 of the Civil Service Law when a two-year contract is revised in its second year so that the agreement will continue in existence for a third year.

Subdivision 2 of section 208 of the Civil Service Law states: "An employee organization certified or recognized * * * shall be entitled to unchallenged representation status until seven months prior to the expiration of a written agreement between the public employer and said employee organization determining terms and conditions of employment. For the purposes of this subdivision, (a) any such agreement for a term covering other than the fiscal year of the public employer shall be deemed to expire with the fiscal year ending immediately prior to the termination date of such agreement, (b) any such agreement having a term in excess of three years shall be treated as an agreement for a term of three years and (c) extensions of any such agreement shall not extend the period of unchallenged representation status."

CSEA submits that the correct interpretation of this subdivision requires that the total three-year period from April 1,

1976 through March 31, 1979 constitutes the measuring period for determining the length of unchallenged representation status provided for in the statute. Therefore, the protected status should continue until seven months prior to the expiration of the third year covered by contract, i.e., until August 31, 1978. This construction would make the instant PEF petition filed on August 31, 1977, untimely and require an annulment of PERB's certification of PEF as the representative of the PS&T unit.

It is CESA's argument, in which the State joins, that paragraphs (b) and (c) of subdivision 2 of section 208 of the Civil Service Law must be read together. The bar to continuing exclusive representation status would, therefore, be applicable only when a contract extension exceeded the three-year limit.

PERB, on the other hand, characterizes this interpretation of the statute as "strained and contrary to the clear policy of the law." It has, in effect, adopted the position of the National Labor Relations Board (NLRB) on similar questions in the private sector wherein it has held that a premature extension of an employment agreement does not extend the period of unchallenged status beyond that which resulted from the duration of the original contract *(Deluxe Metal Furniture Co.,* 42 LRRM 1470).

■ While the intent behind subdivision 2 of section 208 of the Civil Service Law is unclear and both sides present what may be considered reasonable interpretations thereof, we adhere to the basic rules that the construction given a statute by the agency responsible for its administration should not be lightly set aside *(Matter of Ward v Nyquist,* 43 NY2d 57; *Matter of Lezette v Board of Educ.,* 35 NY2d 272), and should be upheld if not irrational or unreasonable *(Matter of Howard v Wyman,* 28 NY2d 434; *Matter of Elmsford Transp. Corp. v Schuler,* 63 AD2d 1036). Accordingly, we sustain PERB's finding that the petition was timely filed.

■ The charge of favoritism on the part of the State towards PEF is founded upon the prolonged retention on the State payroll of one John Kraemer as a "no-show employee". For at least six years prior to March 30, 1976, this individual enjoyed a special status at the Department of Labor whereby he devoted his energies to union affairs on behalf of Service Employees International Union (SEIU) and later PEF while being paid by the State. Efforts to cure this impropriety were

met with unfulfilled promises or open defiance until March 30, 1976 when steps were taken to eliminate the special treatment being given to Kraemer, then a prominent PEF official. Thereafter, he used accumulated leave credit to pursue his "other interests", but when the available credit was exhausted he still remained among the missing. As a result, his salary was withheld and he received an unsatisfactory work performance rating for the year 1977. At the time of this proceeding, his employee status was unsettled. However, it is clear that disciplinary measures have not been instituted by the Industrial Commissioner because, as he explained at the director's hearing, he felt the disciplining of a prominent PEF official would be inappropriate during a contested election campaign. PERB accepted this decision of the Industrial Commissioner as a reasonable one under all the circumstances, and while we do not pass upon the wisdom of this choice, we cannot say it was unreasonable.

While the record contains hundreds of pages of testimony relative to the status and activities of Kraemer and his various confrontations with his superiors, the director excluded from consideration all activities prior to August 31, 1977, the date on which PEF filed its certification petition. PERB has adopted this position and in our view it is a sound one. Otherwise, investigations of election interference could become history lessons. Moreover, we conclude that there is substantial evidence to support PERB's finding that CSEA has failed to establish any impact on the election arising from the conduct of State officials during the compaign, and John Kraemer in particular. We recognize that his mere presence on the scene coupled with the notoriety of his high-level connections could influence others, but this alone is not enough to overturn the results of an election. However, this pattern of shameless conduct over a period of years strikes at the very heart of the governmental process and mandates close scrutiny by the appropriate prosecutorial authority. We note that the record contains a copy of a letter, dated May 23, 1978, from the District Attorney of Albany County to the counsel for CSEA requesting any information concerning these matters. Accordingly, we direct that the original record herein be made available to the office of the District Attorney of Albany County for his examination and such action as he may deem appropriate.

■ In determining the alleged defects in the showing of

interest, we are called upon to examine a multitude of particularized charges both substantive and procedural in nature. Some of these objections to PERB's determination that PEF's showing of interest was sufficient raise troublesome questions. At the threshold is CSEA's contention that the 30% showing of interest requirement under PERB's rule (4 NYCRR 201.3) is a jurisdictional prerequisite to obtaining a representative election. In rejecting this argument, PERB relied upon its own rule that the director's determination as to the timeliness and numerical sufficiency of a showing of interest is a ministerial act not reviewable by the board itself (4 NYCRR 201.4 [c]). Again, PERB has adopted the reasoning of the NLRB, which has held that the sufficiency of a showing of interest in the private sector is not a jurisdictional prerequisite to the election *(N. L. R. B. v Louisville Chair Co.,* 385 F2d 922, 926). The process is one of administrative convenience and we reject CSEA's contention on this issue.

■■ We also reject CSEA's constitutional argument that it has a constitutionally protected interest in continuing as the exclusive bargaining agent for the PS&T unit. The right to organize and bargain collectively belongs to the public employees (Civil Service Law, §§ 202, 203). The union's rights are limited to those specified under section 208 of the Civil Service Law which does not create a property interest of constitutional dimensions (cf. *Board of Regents v Roth,* 408 US 564). CSEA also challenges the constitutionality of subdivision (b) of section 213 of the Civil Service Law which prohibits judicial review of any orders made by PERB or its agents until the order of certification is made. While delay in judicial review may create undue burdens upon a party, the wisdom of withholding review of questions which may be mooted by an election has been recognized in this State (see *New York Public Interest Research Group v Carey,* 42 NY2d 527; *Matter of McCabe v Voorhis,* 243 NY 401). Since there is a reasonable basis for this provision, its constitutionality must be sustained.

■ Of greater substance are the issues raised by CSEA's claim of substantial forgeries in PEF's showing of interest and PERB's dismissal of the claim of forgery for lack of evidence. The issue was raised preliminarily, but CSEA's request for investigation by PERB was denied for matters of policy. However, at the postelection hearing CSEA presented testimony from a former member of New York State United Teachers (NYSUT) and coeditor of PEF's campaign publica-

tions that he was told the showing of interest contained some 5,000 forged names and another 5,000 names from outside the PS&T unit. The sources of this information were revealed and their testimony was made part of the record. The evidence presented was either hearsay or direct denial of any wrongdoing or knowledge thereof. It was established, however, that PEF's showing of interest did include 5,000 names from outside the PS&T unit, but these names were not counted in arriving at the 30% requirement.

While the "bandwagon" effect of these additional names is questioned by CSEA, it was the claim of forgery that created enough uncertainty in the mind of the director to cause him to conduct his own investigation of the serious charges made (4 NYCRR 201.4 [e]). In his report the director had stated that "at this point in my investigation there is now sufficient objective and circumstantial evidence to warrant going forward, and I have done so in a manner which preserves the confidentiality of the showing of interest." It is the manner in which that investigation was conducted that arouses a certain uneasiness in reviewing PERB's ultimate determination that the election represented a genuine expression of the free choice of the voters. The director engaged a handwriting expert who was given exemplars of four people involved in the PEF campaign. After reviewing approximately 1,000 signatures in the showing of interest, which were not randomly selected, the expert concluded that there was no evidence of common authorship in the showing of interest. Having made the decision to investigate the question of forgery, the director was bound to proceed in a manner reasonably related to the result sought to be achieved. He did not do so. The method used by the director's handwriting expert merely disproved a particular *method* of forgery rather than the *presence* of forgery.

CSEA had repeatedly urged that the director take a random sampling of the signature cards in the showing of interest and have those signatures checked against known signatures of the employees in order to determine their authenticity. This method would have required the checking of only 450 signatures and would have determined the total number of forgeries in the showing of interest within a 5% margin of error. Quick, simple and inexpensive, this method would have resolved any lingering doubts as to the validity of PEF's showing of interest. The record fails to disclose any reason for the

rejection of this seemingly foolproof method of deciding an issue critical to the resolution of the ultimate question presented. Accordingly, we find there is presented for our determination more than a mere review of the choice of the methods selected by the administrative agency (see Civil Service Law, § 213; *Matter of Town of Clay v Helsby,* 51 AD2d 200, 204-205). When the method available is measured against the one selected, the action taken lacked a reasonable basis upon which to determine the presence of forged signatures. Thus it was arbitrary and capricious. Moreover, we further reject PERB's argument, in which PEF has joined, that the election itself has cured any defects in the showing of interest. This argument is certainly not appropriate when the issue, as here, is the extent to which fraud has poisoned the electoral process. A substantial forgery would, of course, taint the election results and should not go unchallenged (cf. *Town of Babylon v Local 100, Serv. Employees Int. Union, AFL-CIO,* 6 PERB, par 3047, p 3089).

■ Finally, we reach the issue of PEF's status as an "employee organization", which is defined as an organization of any kind having as its primary purpose the improvement of terms and conditions of employment for public employees (Civil Service Law, § 201, subd 5). CSEA makes a strong argument that PEF does not meet this definition because it is not an organization at all since it has no membership, no employees, no bank accounts, no officers, nor any indicia of an organization. It further argues that PEF's only purpose is to supplant CSEA. While PERB has found that PEF was created as a vehicle through which NYSUT and SEIU could jointly supplant CSEA as the representative of State employees, this is not inconsistent with its primary purpose of improving the terms and conditions of employment for public employees. PERB also found that since a substantial number of public employees indicated their desire to become members of PEF, current membership is not controlling. While this reasoning may seem circular, it is reasonable and supports a more liberal construction of the terms "employees organization"; one that is preferred by PERB and followed by the NLRB in the private sector *(Indiana Metal Prods. Corp. v N. L. R. B.,* 202 F2d 613). We, therefore, sustain PERB's finding on this issue.

Accordingly, and for the reasons stated, the judgment of Special Term should be affirmed, and the determination of

PERB that the procedure used to determine the question of forgery in the showing of interest was reasonable and fairly conducted and that there was no reason to consider CSEA's objections to that procedure is annulled.

In Proceeding No. 1, the judgment should be affirmed, without costs.

In Proceeding No. 2, the determination should be annulled, without costs, and the matter remitted to the Public Employment Relations Board for further proceedings not inconsistent herewith and the stay of certification to be continued.

MAHONEY, P. J. (concurring in part and dissenting in part). Although I agree with my colleagues that the judgment in Proceeding No. 1 should be affirmed, I disagree with them that in Proceeding No. 2 a remittal to PERB is required "for further proceedings not inconsistent herewith", presumably, for PERB to employ the methodology proposed by the CSEA to detect if forgeries permeated the showing of interest by PEF to such a degree that the election result should be voided. Such a result, in my view, would usurp the significant role legislatively delegated to PERB (Civil Service Law, § 205) to resolve disputes concerning the representative status of employee organizations, to establish procedures for the prevention of improper employer and employee practices and to hold such hearings and make such inquiries as it deems necessary for it properly to carry out its functions and powers (Civil Service Law, § 205, subd 5, pars [b], [d], [j]). In conducting the postelection hearing PERB afforded CSEA an opportunity to come forward with such proof as it had bearing on its allegation of substantial forgery. CSEA responded by calling as its witness Ned Hopkins, a former employee of PEF. Mr. Hopkins testified that one Ms. Fellner had told him that John Geagan, a codirector of the PEF campaign, had told her that Diane Dougherty, the SEIU employee in charge of compiling the showing of interest for PEF, was responsible for the forgeries. Ms. Fellner denied this and testified she had mentioned only that several thousand signatures from nonunit employees had been submitted in the showing of interest.* She also testified that she had not forged the signatures on any cards or knew of anyone who had done so. Both Geagan and Dougherty denied having any knowledge of forgeries and insisted they

---

* Actually, there were 5,000 nonunit signatures, but it is not contended that the number of unit signatures could not comprise the requisite 30% showing of interest.

had not forged any signatures. The director credited the compounded hearsay testimony of Hopkins over that of Fellner, but found the testimony of Geagan and Dougherty to be convincing. Clearly, these factual findings based upon credibility, a function solely within the competence of the fact finder, fall far short of proving forgery. If the matter had concluded there and a proceeding was commenced to annul a determination confirming the election results, I think it only fair to conclude that a confirmance based on substantial evidence to support the determination would follow. However, the director found "sufficient objective and circumstantial evidence to warrant going forward" and he did so (4 NYCRR 201.4, 201.9) by engaging a handwriting expert. The expert used exemplars of Dougherty, Geagan, Kraemer and Canny, all directly involved in obtaining the showing of interest cards of unit members, and compared the signatures thereon with approximately 1,000 showing of interest cards of unit members which contained one or more characters which appeared in the known writings of the four suspects and found no evidence of common authorship. Now, CSEA insists, and the majority agrees, there is a better method of detecting forgeries than that employed by the director and the failure to use that method was an arbitrary and capricious act requiring annulment. I cannot agree.

Neither statutory law (Civil Service Law, § 200 *et seq.*), nor the State Constitution commands a hearing for the resolution of contested election results following a challenge by one representative unit against another. Paragraph (j) of subdivision 5 of section 205 of the Civil Service Law authorizes PERB "[t]o hold such hearings and make such inquiries *as it deems necessary* for it properly to carry out its functions and powers." (Emphasis added.) However, once PERB exercises this discretionary power and, pursuant to its own internal regulations, delegates the authority to hear, inquire and determine to its director, it must proceed to develop a hearing record that lends itself to judicial scrutiny. Once the record is developed and the administrative determination challenged in court, the standard for judicial review is whether that result is supported by substantial evidence (cf. *Matter of Older v Board of Educ.*, 27 NY2d 333, 337). It follows, therefore, that this court need only review PERB's dismissal of allegations of forgery for substantial evidence supporting the board's determination *(300 Gramatan Ave. Assoc. v State Div. of Human*

*Rights,* 45 NY2d 176, 181-182). Issues of credibility, as here, are for the administrative agency to decide and where there is substantial evidence, again as here, to support either of two opposing conclusions, the board's determination must be upheld *(Matter of Collins v Codd,* 38 NY2d 269; *Matter of Manhattan Scene v State Liq. Auth.,* 58 AD2d 1010).

However, since the majority opinion does not state that the challenged result is *not* supported by substantial evidence, but, rather, that the selection of the method for testing forgeries was an arbitrary and capricious act lacking a reasonable basis, it is necessary to examine that act to determine if it drained the board's conclusion of rationality to an extent requiring annulment *(Matter of Pell v Board of Educ.,* 34 NY2d 222; *Matter of 125 Bar Corp. v State Liq. Auth.,* 24 NY2d 174; *Sag Harbor Union Free School Dist. v Helsby,* 54 AD2d 391). There was no direct proof of forgery, only compounded hearsay. Where evidence of forgery is entirely hearsay, as here, a finding of guilt is not based on substantial evidence *(Matter of Riverton Funeral Home v Whalen,* 63 AD2d 887). Next, the director did investigate the authenticity of the signatures using the services of an expert whose credentials are not challenged. Where alternate methods of arriving at a common goal are proposed, failure of an administrative agency to select what most would consider to be the better method does not render that determination arbitrary as a matter of law. Where an administrator adopts one of several conflicting opinions, it is not the province of the court to substitute its judgment unless the agency's determination is unreasonable or without a basis in law *(Matter of Denise R. v Lavine,* 39 NY2d 279, 283; cf. *Matter of Talamo v Murphy,* 38 NY2d 637; *Matter of Wilcox v Stern,* 18 NY2d 195, 203).

Accordingly, in Proceeding No. 2, PERB's determination should be confirmed.

GREENBLOTT, SWEENEY and STALEY, JR., JJ., concur with KANE, J.; MAHONEY, P. J., concurs in part and dissents in part in an opinion.

In Proceeding No. 1, judgment affirmed, without costs.

In Proceeding No. 2, determination annulled, without costs, and matter remitted to the Public Employment Relations Board for further proceedings not inconsistent herewith and the stay of certification to be continued.