J. P. STEVENS & CO., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Amalgamated Clothing & Textile Work-
ers Union, AFL–CIO, CLC, Intervenor.

AMALGAMATED CLOTHING &
TEXTILE WORKERS UNION,
AFL–CIO, CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 79–1502, 80–1126.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1980.

Decided Jan. 8, 1982.

Counsel, Joel Ronald Ax, Deputy Gen. Counsel, New York City, on brief), for intervenor.

W. Christian Schumann, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D. C., on brief), for respondent.

Before FIELD, Senior Circuit Judge, and SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

J. P. Stevens & Company (Stevens or the Company) and the Amalgamated Clothing and Textile Workers Union, AFL–CIO, (the Union) petition for review of an order holding that the Company violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act [29 U.S.C. §§ 158(a)(1), (a)(5)]. Stevens seeks to set aside the order and the Union requests expansion of the remedy. The Board has filed a cross-application for enforcement. We decline to expand the remedy as requested by the Union and enforce all the provisions of the order.

The Union [1] began an organization campaign at the Company's Wallace, North Carolina plants and warehouses in September 1974. [2] Although the Union had accumulated 561 signature cards from the facilities' 1000 employees by February 19, 1975, the Company easily won a representation election held on that date with 540 votes compared to 404 votes for the Union.

The Union subsequently filed charges that the Company had committed unfair labor practices during the organization

L. Gray Geddie, Jr., Greenville, S. C. (Homer L. Deakins, Jr., Martha C. Perrin, Ogletree, Deakins, Smoak, Stewart & Edwards, Greenville, S. C., on brief), for petitioner.

Robert Tim Brown, Asst. Gen. Counsel, New York City (Arthur M. Goldberg, Gen.

1. The original charging party was the Textile Workers Union of America, which merged with the Amalgamated Clothing Workers of America on June 2, 1976. This opinion will refer to that entity, regardless of its formal designation at the time of events being discussed, as "the Union."

2. Two prior unsuccessful campaigns, in 1969–70 and 1973, were later found to involve company unfair labor practices. *NLRB v. J. P. Stevens & Co.*, 464 F.2d 1326 (2d Cir. 1972),

*cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973) (discharging union sympathizers, etc., during the 1967 campaign); *NLRB v. J. P. Stevens & Co.*, 563 F.2d 8 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978) (electronic surveillance of employees, selective enforcement of unpublished rules, etc., in 1973); *J. P. Stevens & Co.*, 220 N.L.R.B. 270 (1975) (interrogation, soliciting for surveillance, etc.).

campaign which invalidated the election results. The Board issued a formal complaint in January 1977. After extensive hearings on the issues, the Board's Administrative Law Judge (ALJ) concluded that the Company had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(5), by discouraging union organization and by refusing to bargain with the Union. The Board affirmed the ALJ's ruling that sections 8(a)(1) and 8(a)(5) were violated and ordered the results of the February 19 election set aside. The Board's order contained notice and access provisions and required the Company to cease and desist from various specific unfair labor practices, including impeding employee distribution of union literature in nonworking areas at nonworking times, engaging in employee surveillance, threatening employees with discharge because of union activity and failing to bargain in good faith. Also, the Company was ordered to bargain with the union upon request and to pay both the Union's organizational expenses and the litigation costs of the Union and the Board. *J. P. Stevens & Co.*, 244 N.L.R.B. No. 82 (1979).

## I.

The Board found that the Company had violated section 8(a)(1) on a number of occasions.

### a.

In April 1974, when all Stevens employees received the annual statement of individual accumulated equity in the companywide profit-sharing plan, they learned of a substantial decrease in the value of their shares because of the nation's economic recession in 1973–74. That development did not pass unnoticed. Four months after the equity statements were released, the Union won a collective bargaining election at Stevens' Roanoke Rapids plant; the recent drop in employees' profit-sharing equity apparently was a major issue in that election. On January 21, 1975, only four weeks before the representation election at the Wallace plants, Stevens announced to all its 38,000 hourly employees the institution of a companywide guaranteed "floor" for each employee's equity in the profit-sharing plan, insulating the value of the shares from losses due to stock market changes.

The Board found that announcement of profit-sharing changes one month prior to the Wallace election was a section 8(a)(1) violation. The ALJ had concluded that the responsible Stevens' officer's testimony that the benefits were a reasonable Company attempt to compete in the labor market and that the announcement immediately followed necessary actuarial studies was incredible. He found that "the very nature of this benefit discounted any urgency, which required announcement of the new benefit prior to the election."

We agree. It is axiomatic that an employer cannot confer economic benefits on its employees to influence their views of unionization.

> The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

*NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964) (footnote omitted). An employer violates section 8(a)(1) by granting employee benefits, even for legitimate business reasons, if the timing of the announcement is calculated to discourage union activity, *NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988 (4th Cir. 1979), or to restrict the employees' freedom of choice. *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490 (4th Cir. 1972). Improvements in employee benefits are presumptively improper if announced when a representation election is pending. *See Exchange Parts, supra; NLRB v. Eastern Smelting and Refining Corp.*, 598 F.2d 666 (1st Cir. 1979).

The profit-sharing benefits were declared more than a month after the election petition was filed, the day after the Board announced the date of the representation

election, and after the plan had become a campaign issue at Wallace. Since the Company failed to adequately rebut the presumption of impropriety by showing that the announcement could not reasonably have been delayed until after the election, the Board's decision on this issue must be affirmed.

b.

The Board also found that Stevens violated section 8(a)(1) when it supplemented the unemployment benefits of employees who had been laid off in September, 1974. The supplemental payments were implemented after it was learned that the affected employees received $21.00 less each week because they were laid off in late September rather than after the first of October, 1974. The North Carolina unemployment compensation law had been amended to provide greater benefits after October 1, 1974.

After Stevens' officials unsuccessfully attempted to have the State Employment Security Commission equalize benefits for the laid-off employees, they decided to supplement the affected employees' benefits with Company funds. Announcement of that cash bonus was made on February 11, 1975, eight days before the representation election.

The ALJ found that the Wallace plants were the focal point of employee dissatisfaction about the unequal unemployment benefits. He also found that the supplemental payments were hurriedly and prematurely announced, even before Stevens had computed the specific amounts to be paid to individuals, to quell unrest and discourage union support. Company officials largely responsible for the cash bonus were found to be deeply involved in resisting the organization of the Wallace plants.[3] The Board concluded that the untimely announcement was another violation of section 8(a)(1). Here, again, there is substantial evidence to support the Board's decision

that Stevens failed to justify its actions. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Company argues that our holding in *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490 (4th Cir. 1972) (*Shelby*), excuses its untimely announcement of the profit-sharing and unemployment benefits. *Shelby*, however, is inapposite—there, one company action was violative and one not violative of section 8(a)(1). The "unemployment" bonus paid at Wallace in the case *sub judice* is analogous to the additional paid holiday in *Shelby*, which was held to violate section 8(a)(1). Stevens contends that it was in an impossible dilemma: either to announce the benefits at all plants except Wallace, or to announce only at Wallace, would have been an unfair labor practice. Stevens does not indicate, however, why a brief one-month postponement of *any* announcement was unfeasible or unreasonable. Likewise, there is no evidence in our case that the Wallace employees had heightened expectations concerning forthcoming benefits, as did the Shelby workers, such that withholding announcements of the profit-sharing or unemployment benefits for another month would have influenced the election. *See also NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1000–01 (10th Cir. 1977).

c.

The Board found that Company supervisory employees wrongfully threatened an employee with discharge for Union activity, solicited employees both to testify before the Board to invalidate their signatures on the authorization cards and to spy on fellow employees, and gave the impression of keeping the employees under surveillance. The Board also found that Wallace supervisors illegally interfered with the distribution of organizational literature on the eve and day of the representation election. Stevens concedes that those actions

---

**3.** The Company's concern for their employees' welfare in January 1975, as the election approached, was in marked contrast to its seemingly disinterested announcement in November 1974, one month prior to filing of the election petition, that the Company had done what it could to remedy the situation but would do no more.

were wrongful and violative of section 8(a)(1).[4]

Although some of those events may well have had limited effects, others certainly had more far-reaching consequences. For example, six Stevens supervisors locked elbows at the main entrance of a Wallace plant on the day of the election, excluding employees who wished to distribute literature in nonworking areas of the factory. During the ensuing argument one supervisor threatened to call the police to remove the union sympathizers, while another later did so; the employees abandoned their attempts to enter the plant. We believe that this display of physical force and Company intransigence to unionization—at shift change, in the main plant entrance, before a group of employee spectators—was an effective reminder of Company attitudes and strength. Accounts of the event were undoubtedly rapidly disseminated throughout the plant during coffee breaks on that election day. The Board properly found those incidents to be section 8(a)(1) violations.

## II.

Believing that it had obtained a card-majority of the Wallace employees, the Union demanded that the Company acknowledge it as exclusive bargaining agent on December 16, 1974. Another demand for recognition was made on January 9, 1975. Stevens persistently refused to bargain with the Union, however, and committed most of the section 8(a)(1) unfair labor practices at issue in this case after the Union's demands for recognition and prior to the representation election. Despite having obtained 561 valid authorization cards, representing a majority of the work force of 1,000, the Union suffered a heavy defeat at the polls.

The ALJ found that the Union had made effective continuing demands for recognition prior to the election and that the Company violated 8(a)(1) and (5) by refusing to recognize and bargain with the Union as prescribed by *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Furthermore, the ALJ found that during the organization campaign the Company engaged in a pattern of unlawful conduct designed to foment reversal of employee sentiment as expressed by the authorization cards. As a result, he held that the cards were a more reliable measure of employee choice than were the results of the February 19, 1975 election, and concluded that the unfair labor practices engaged in by the Company were sufficiently serious to warrant the imposition of a bargaining order as authorized by *Gissel, supra.*

Based on these findings, the Board ordered the Company to bargain with the Union on demand.

Issuance of a *"Gissel"* bargaining order is not confined to situations in which the employer engaged in especially egregious misconduct, but also is appropriate "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." *Gissel* at 614, 89 S.Ct. at 1940. It is necessary, however, in issuing such an order, that the Board make specific findings as to the residual effects of the employer's unfair practices, the possibility of assuring a fair rerun election and the likelihood of continuing, or recurring, employer misconduct; boilerplate language and conclusory findings will not suffice. *Appletree Chevrolet*, 608 F.2d at 997–98. Stevens complains that the ALJ did not comply with the requirement of specificity. We disagree. The ALJ's findings, which the Board affirmed, demonstrated that a bargaining order was the only method of accomplishing the wishes of a majority of Stevens employees.

The ALJ found that the implementation of the "floor" on profit-sharing and the

---

**4.** The Company claims that under a new literature distribution policy promulgated in January 1979, pursuant to an order of the Second Circuit, distribution which was prohibited at Wallace now would be permitted. We note that a charging party and the Board generally are entitled to relief despite apparent mootness or duplication of remedies—especially when the employer continually has eschewed voluntary relief and has evidenced unconcern for Board orders.

grant of supplemental unemployment benefits alleviated employee discontent regarding major issues in the organizational campaign. Conventional Board remedies would be ineffectual in restoring the *status quo ante* with respect to these issues or in assuring that a rerun election could be held devoid of their lingering effects.

Also, Company interference with employee literature distribution on the eve and day of the election, the ALJ concluded, "reflected the Employer's disdain for clearly established statutory rights at a time proximate to the casting of the ballots."

■ In determining whether past unfair labor practices constitute a future threat to collective bargaining, the Board should consider whether the employer is likely to ignore less stringent Board remedies. *First Lakewood Associates v. NLRB*, 582 F.2d 416 (7th Cir. 1978). The ALJ found that the record attested to repeated violations in areas where J. P. Stevens had been ordered to effect remedies in the past. He concluded:

> [T]he propensity of that firm to ignore statutory remedies is underscored by the fact that, while the Wallace campaign was conducted within the protective province of a contempt order, analysis of the evidence suggests convincingly that highranking officials of [the Company] acted deliberately and with a directness of purpose in contravening unmistakable statutory guarantees and the spirit of the contempt order to frustrate employee choice during that campaign.

■ In this light, we are especially disturbed by the Company's 1977 attempts to encourage employee repudiation of their authorization cards in testimony before the Board, conduct the Board found to be clearly coercive and violative of section 8(a)(1).[5] Leaving aside serious questions of witness tampering, we believe that such conduct forcefully demonstrates the Company's continuing intention to resist unionization at any cost. A rerun election would clearly have been futile. "Employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Appletree Chevrolet*, 608 F.2d at 996.

## III.

In addition to issuing a bargaining order, the Board ordered a broad range of other remedies as proposed by the ALJ. It imposed not only the customary remedial cease-and-desist and notice provisions, but also required Stevens to hold mandatory employee meetings at each plant at which the required notice would be read. It declined, however, to impose companywide access for the Union beyond that required in the Second Circuit's 1977 order in *NLRB v. J. P. Stevens & Co.*, 563 F.2d 8 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978). Other affirmative remedies included orders that Stevens pay the Union's organization expenses plus interest for the 1974–75 Wallace campaign, and pay the litigation expenses plus interest of both the Board and the Union.

5. Each Wallace employee was required to attend a small meeting with plant management at which a prepared speech concerning unionization was presented; "round-table" discussions with the plant manager followed. Perhaps the most disturbing section of the speech stated:

> In the upcoming legal proceeding, those employees who signed cards prior to the last election will be called into court to testify about their signature. Unless an employee can prove that he/she was misled or deceived into signing a card, or fraud was involved, or the card was not signed by the employee, the Labor Board will count the card for the Union. If the union can get a majority of cards from employees working in 1974 counted by the Labor Board, then they

will try to prove that the only reason they lost the election was because of three things we did.

That program must have been successful, for the ALJ found that approximately 40 employees gave intentionally inaccurate testimony repudiating their authorization cards.

Stevens' behavior is even more astonishing in light of a prior contempt order, *NLRB v. J. P. Stevens & Co.*, 464 F.2d 1326 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973), and the then-pending show-cause order, that it had received for its misconduct at the Wallace facilities. *NLRB v. J. P. Stevens & Co.*, 563 F.2d 8 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978).

The Union argues for an expanded order. Stevens argues that the Board's affirmative remedies are improper, that the bargaining order was unwarranted, and that the imposition of the litigation and organization expenses was both unprecedented and unjustified by the facts.

The Union's contention is that the Board's remedies were inadequate. It argues that a companywide bargaining order, an interim dispute-resolution mechanism, and a make-whole remedy related to the profit-sharing plan are necessary to vindicate the section 7 rights of Stevens employees.

 It is well settled that the Board's remedial power under the Act is "a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). A Board order should be upheld unless shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). After subjecting the Board's decision to our limited scope of review, we conclude that the Board's refusal to impose the additional sanctions requested by the Union is properly supported by the evidence.

Review of the record, briefs and oral argument demonstrates that Stevens' contentions concerning the notice and access provisions and bargaining order are meritless and require no extended discussion.

 That portion of the order requiring reimbursement of organization and litigation expense, however, is another matter. Although we enforce it, it is recognized that this is an expansion by the Board of the use of this remedy and such expansion requires exploration and articulated reasoning by the Board before it may be ordered. The

Board has a duty to alter its policies in response to new circumstances or past experiences, but when it deviates from prior precedents it must provide a reasoned explanation for the change. *J. P. Stevens Co. v. NLRB*, 623 F.2d 322 (4th Cir. 1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). This provides assurance that the prior standard is being changed, not ignored, and that the Board is faithful, and not indifferent, to the rule of law. *See Greyhound Corp. v. I.C.C.*, 551 F.2d 414 (D.C.Cir.1977).

In obedience to the Act's requirement of remedial, rather than punitive, remedies, 29 U.S.C. § 160(c), the Board long refrained from awarding litigation or organization expenses against an employer. That well-established principle was modified almost a decade ago, however, when it was decided that imposing such expenses might be appropriate in certain specific situations. In *Tiidee Products, Inc.*, 194 N.L.R.B. 1234 (1972) (Supp.Decision), the Board ordered the reimbursement of litigation expenses after finding that the employer had engaged in "frivolous" litigation.[6] Subsequent cases have further articulated this exception to the general rule and the distinction between defenses which are "debatable," rather than "frivolous." The Board's position was clearly set out in a 1974 decision:

Thus, [prior] cases, when read together, indicated our intent to refrain from assessing litigation expenses against a respondent, notwithstanding that the respondent may be found to have engaged in 'clearly aggravated and pervasive misconduct' or in the 'flagrant repetition of conduct previously found unlawful,' where the defenses raised by that respondent are 'debatable' rather than 'frivolous.' Likewise, it was our intention, under similar circumstances, to refrain from ordering reimbursement of excess organi-

---

6. *Tiidee* was heard on remand from the District of Columbia Circuit Court of Appeals which had decided, contrary to the Board's first opinion in the case, that the Board *did* have statutory authority to impose such affirmative "make

whole" relief. *Int'l Union of Electrical, Radio, and Machine Workers v. NLRB*, 426 F.2d 1243 (D.C.Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).

zational costs although a nexus has been shown between such excess costs incurred by a union and the unfair labor practices committed by an employer.

*Heck's, Inc.*, 215 N.L.R.B. 765, 767 (1974). *See also J. P. Stevens & Co. v. NLRB*, 612 F.2d 881 (4th Cir. 1980), *cert. denied*, 446 U.S. 916, 100 S.Ct. 1848, 64 L.Ed.2d 270 (1980); *Winn-Dixie Stores, Inc.*, 224 N.L.R.B. 1418 (1976). The Supreme Court has expressly approved the Board's "debatable-frivolous" standard. *NLRB v. Food Store Employees Union*, 417 U.S. 1, 8–9, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1974).

The Board in *Heck's* concluded that an employer's defense was "debatable," thus precluding reimbursement of organization and litigation expenses, when it was based on resolving the credibility of witnesses. *Id.* at 768.

Stevens contends that its defenses were, therefore, clearly debatable. It argues that since numerous credibility determinations were necessary to the resolution of the section 8(a)(1) violation issues, its defenses to Board sanctions and suit were neither "patently frivolous" nor "clearly meritless on their face."

Under the *Heck's* standard, Stevens indisputably should be liable for those expenses resulting from the litigation of issues arising from the Wallace supervisors' illegal interference with the employees' access to the plants and distribution of literature. Stevens' defenses to these 8(a)(1) violations are clearly "frivolous."

The Board's order as it relates to reimbursement for expenses arising from other unfair labor practices, however, extends beyond the boundaries of *Heck's* and identifies a narrow new category of cases in which organization and litigation costs may be awarded.

Such an extension is in accord with the Board's suggestion in *Heck's* that the "debatable-frivolous" distinction might prove insufficient to cover every case involving organization or litigation expenses. The Board there expressly refused to limit future imposition of such awards to "frivolous" litigation:

Whether, for instance, an award to compensate for excess organizational costs ought, in the future, to be considered as necessary to restoring the *status quo ante* in certain factual contexts rather than as an extraordinary remedy to be applied only in the case involving frivolous defenses, as we have heretofore held, is an issue which we do not intend here to foreclose from thorough consideration in future cases. Nor do we intend to exclude from consideration whether, in determining the appropriateness of awards of attorney fees, litigation costs, and excess organizational costs, we ought to apply some more definitive criterion than the distinction between "debatable" and "frivolous" defenses which thus far we have been utilizing.

. . . .

It is, we believe, a continuing function of this administrative agency to consider on a case-by-case basis, in the light of both our experience and the facts of each case, what remedy will best remedy the misconduct found.

215 N.L.R.B. at 768.

The Board adopted the ALJ's reasoning which quoted the above language from its decision in *Heck's, supra*. While acknowledging that the Board's remedial arsenal ought only to be tapped in the interest of safeguarding employee rights, the ALJ concluded that Stevens' "outrageous" behavior at Wallace gave rise to a new basis for the awarding of organization and litigation expenses. The ALJ noted that the 1974–1975 campaign at Wallace was the third Union organizational effort at those plants in the past 15 years. Neither prior campaign culminated in an election; rather they culminated in contempt citations against Stevens. Although the latest campaign was conducted under the safeguards of a prior contempt order from the Second Circuit, the ALJ found that Stevens persisted in "reversing the expressed choice of employees through unfair labor practices initiated at high management levels." Such behavior, the ALJ concluded, was sufficient to

justify the award of organization and litigation expenses:

> This record convincingly demonstrates that past efforts by the Union to organize employees at Wallace were abandoned in the face of flagrant behavior on the part of the [Company] which violated both the Act and outstanding court orders. Thus, the record herein warrants the conclusion that the Union in 1974 was required to engage in a renewal of a prolonged attempt at organization, requiring extraordinary expenditures, which it would not have sustained were Wallace employees afforded the opportunity to effect their right of self determination in an atmosphere free of employer misconduct. In view of the foregoing, restoration of the *status quo ante* to the extent possible is imperative, and saving the Union whole for unnecessary organizational costs is viewed as contributing to that end.
>
> . . . .
>
> [I]t shall [also] be recommended that the [Company] reimburse the Union for all reasonable and necessary costs incurred in litigating this proceeding. The predicate for such relief is not limited to the seriousness and sustained nature of the violations found herein, but also finds support in Stevens' policy of intransigence whereby court-enforced orders of the Board have been flouted and contempt decrees reduced to mockery.

Although it was not specifically requested, the ALJ also recommended that the Board be reimbursed for its litigation costs. He concluded that "it is only reasonable that the general tax paying community be relieved from shouldering the expenses entailed in protracted litigation at the hand of Stevens' lawlessness."

■ The Board did not abuse its discretion by ordering the award of organization and litigation expenses. "A remedy 'to effectuate the policies of . . . this [Act],' § 10(c), must dispel, compensate for, or at least neutralize, the frustrating effects of persistent illegal activity." *J. P. Stevens & Co., Inc. v. NLRB*, 417 F.2d 533, 541 (5th Cir. 1969). The Board may tailor the reme-

dy so as to implement the purposes of the Act as they relate to the dispute as long as the order is remedial instead of punitive. *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). Many of the policy goals which lay behind the original "frivolous-debatable" exception, such as freeing crowded Board and court dockets, thus allowing more rapid resolution of labor-management conflicts, *Tiidee Products, supra*, 194 N.L.R.B. at 1236; preventing "the employer from having a free ride during the period of litigation," i.e., from profiting by the delay, *Int'l Union of Electrical, Radio, and Machine Workers v. NLRB*, 426 F.2d 1243, 1251 (D.C.Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); and redressing litigation and organization expenses intentionally forced on an aggrieved party or Board by the employer's frivolous acts, *Wellman Industries, Inc.*, 248 N.L.R.B. No. 29 (1980), also are legitimate objectives for, and can be attained by, compensation for litigation and organization expenses in this type of case.

Also, since the litigation and organization expenses in this case are the direct consequences of the Company's unlawful behavior, they cannot be considered "collateral" under the doctrine of *Gullett Gin Co. v. NLRB*, 340 U.S. 361, 364, 71 S.Ct. 337, 95 L.Ed. 337 (1951). *See Wellman Industries, Inc.*, 248 N.L.R.B. No. 29 (1980).

In modifying or expanding its previous practice the Board cannot simply ignore that practice—"it must make a reasoned explanation for the change." *J. P. Stevens & Co. v. NLRB*, 623 F.2d 322, 329 (4th Cir. 1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). It has done so in this case by carefully articulating the reasons for the new rule and specific reasons for applying the rule to this case. The Company's history of litigation before the Board and in the courts, and its resolute resistance to unionization at any cost, may be without equal: almost thirty cases alleging Stevens' unfair labor practices have been decided to date. The Wallace management, having gained experience in labor relations from years of skirmishing with the

Union, nevertheless knowingly and willfully violated two contempt decrees imposed by a court of appeals. As the ALJ concluded:

> [T]he ability of the administrative-judicial system to withstand the Stevens assault upon its integrity is owing, in large measure, to the Union's vigilance, and unrelenting will to commit its legal resources to the fray. Were it to succomb [sic], the exploits of J. P. Stevens would serve as a historic touchstone for those who would defy the law by subjecting employee organization to the type of endurance struggle experienced here.

We agree. There is no question that the Board has the power to take J. P. Stevens' history of recalcitrance into account in designing its order. Indeed, it has an obligation to do so. *Textile Workers Union v. NLRB*, 475 F.2d 973, 976 (D.C.Cir. 1973).

Routinely imposing such expenses could, of course, tend to deter meritorious litigation by an employer, but we perceive no such intention on the part of the Board. We interpret the Board's expansion of its prior doctrine to be an extremely narrow one. Only in cases of flagrant, aggravated, persistent, and pervasive employer misconduct will the employer's meritless but arguably non-frivolous litigation justify an award of litigation and organization expenses. It may well be that few employers other than J. P. Stevens—"the most notorious recidivist in the field of labor law," *NLRB v. J. P. Stevens & Co.*, 563 F.2d 8, 13 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978)—will come within the narrow confines of this exception.[7]

Since the Company is liable for the Union's litigation and organization expenses and the Board's litigation expenses, the Board, of course, must now determine the amounts of these costs. Therefore, the case is remanded to the Board for an assessment of litigation and organization expenses against the Company in accordance with the views expressed in this opinion.

ENFORCED AND REMANDED FOR DETERMINATION OF EXPENSES.

FIELD, Senior Circuit Judge, dissenting:

In *J. P. Stevens & Co., Inc. v. N.L.R.B.*, 638 F.2d 676 (4th Cir. 1980), the majority of a panel of this Court approved an order of the Board which had held certain language used by Stevens to be coercive even though we previously had found that such language constituted protected speech and was not violative of the Act. The sole basis for the Board's finding in that case was Stevens' long history of anti-union bias and litigation before the Board. In my judgment such action by the Board denied Stevens its rights under the First Amendment and Section 8(c) of the Act solely as punishment for its long history of union opposition, and I was prompted to observe, in dissent, that "such an attainder has no place in our national labor law."

The order of the Board in the present case awarding to the union its organization and litigation expenses carries that "attainder" even further. The majority finds the predicate for the award of these punitive expenses against Stevens to be "the company's history of litigation before the Board and in the courts, and its resolute resistance to unionization at any cost * * *." At p. 776. Assuredly, none of the substantive issues raised by Stevens before the Board would justify such an award. With the possible exception of the leaflet episode, Steven's defenses in this case were neither "patently frivolous" nor "clearly meritless on their face." To the contrary, each and every issue had substantial merit and Stevens was entitled to have those issues heard

---

7. Our emphatic, disapproving language regarding the Company's past behavior should not be misread as a presumption of wrongdoing or as the sole basis for our decision in this case. *Cf. Florida Steel Corp. v. NLRB*, 587 F.2d 735 (5th Cir. 1979) (unfair labor practice "cannot be based solely on the general bias or antiunion attitude of the employer"). As this court has recently noted, however, the Board—and, by inference, the court—need not blind itself to an employer's past infractions when deciding and remedying a case. *J. P. Stevens & Co. v. NLRB*, 638 F.2d 676 (4th Cir. 1980).

by a reasonably fair tribunal. Stevens has now been told by the Board and by the majority of this panel not only that it has lost on the issues but that it must pay a heavy price for its failure to prevail. The net effect of it is that Stevens may litigate before the Board in the future only at the risk of shouldering the litigation and organization expenses as penalties in the event it loses.[1] In my opinion, this action of the Board oversteps the constitutional limits of due process and, in effect, denies Stevens access to the courts. I would reverse.

1. The majority concedes that the award of such expenses could "tend to deter meritorious litigation by an employer". At p. 777. It is suggested, however, that the expansion of the "debatable-frivolous" doctrine of *Heck's* is an extremely narrow one which will be applied to few employers other than Stevens. This, in my opinion, merely underscores the fact that Stevens is being denied its right to fair and equal treatment solely because of its anti-union history. It occurs to me that the cryptic assurance of the majority in footnote 7 that its language regarding Stevens' past behavior should not be construed as a presumption of wrongdoing will offer little comfort or guidance to Stevens and its counsel.